**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF GEORGIA**

**SAVANNAH DIVISION**

| | | |
|---|---|---|
| ROMARE J. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV420-091 |
| | ) | |
| COSCO SHIPPING LINES | ) | |
| CO. LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants COSCO Shipping Lines, Co. Ltd., COSCO Shipping Camellia Limited, and Shanghai Ocean Shipping Co. Ltd. have moved to exclude Plaintiff Romare J. Green's expert witnesses Richard Galuk, Patricia Fletcher, Joseph Crosson, and William Williams.  Doc. 86.  Plaintiff has responded, doc. 94, Defendants have replied, doc. 103, and Plaintiff has sur-replied, doc. 113.  The motion is ripe for disposition.

## I.  BACKGROUND

As the Court has summarized before:

This case involves injuries Plaintiff suffered while working as a longshoreman on the M/V Cosco Shipping Camellia (the "Vessel") which Defendants own and operate.  (Doc. 1, Attach. 1 at 3-5.)  Plaintiff alleges that he was exiting the Vessel via a steep gangway when the handrail collapsed, causing him to

> fall off the gangway and land on the dock adjacent to the gangway. (*Id*. at 4.) Plaintiff alleges that he sustained serious injuries to his right shoulder as a result of the fall.

Doc. 51 at 1-2. The parties agree that the handrail collapsed because a "gangway connecting pin came out of place." Doc. 94 at 2; *see also* doc. 86 at 2 ("[T]he pin which locks the upper and lower half of the gangway handrail together came out, causing the handrail to collapse."). They disagree about what caused the pin to come out and who was responsible. *See generally* docs. 84 & 97.

Plaintiff has proffered four expert witnesses to support his contentions about what caused the pin to come out and that the Defendants are responsible: Joseph Crosson, *see* docs. 86-3, 86-4 & 86-5, Patricia Fletcher, *see* doc. 86-8, Richard Galuk, *see* docs. 86-10 & 86-11, and William Williams, *see* docs. 86-13 & 86-14. Defendants move to exclude each. *See generally* doc. 86. They first argue the experts should be excluded for Plaintiff's alleged failure to comply with Federal Rule of Civil Procedure 26. *Id*. at 5. They alternatively argue that the experts "offer no reliable opinions under [Federal Rule of Evidence] 702. *Id*. at 6. The Court addresses each argument in turn.

## II.   ANALYSIS

### A.   Federal Rules of Civil Procedure 26 and 37

Before turning to the substance of the four experts' testimony, Defendants first challenge the timeliness and completeness of Plaintiff's expert disclosures under Rule 26. *See* doc. 86 at 2-6. The Federal Rules of Civil Procedure require a party seeking to introduce expert testimony at trial to disclose the identity of the expert along with an expert report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications . . . ; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(A)-(B). These disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

A party has a continuing obligation to supplement its expert's report. Fed. R. Civ. P. 26(a)(2)(E). However, the duty to supplement a report does not facilitate an end-run around the initial duty of complete

and timely disclosure. *Sommers v. Hall*, 2010 WL 3463608, at *3 (S.D. Ga. Sept. 1, 2010) (discussing the "obvious potential for abuse" in the rule permitting a party to supplement an expert report); *see also Hamlett v. Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360, 1363, n.5 (S.D. Ga. 2016) ("[T]he rules and case law require timely disclosure and timely supplementation; trial by ambush is not permitted.  Nor are reports that are blatantly untimely or rely on supplementation to dodge a deadline."). Accordingly, glaring omissions in an original expert witness report cannot be cured by a supplement. *Finch v. Owners Ins. Co.*, 2017 WL 6045449, at *2 (S.D. Ga. Dec. 6, 2017) (citing *Goodbys Creek, LLC v. Arch Ins. Co.*, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009)); *see also Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 719 (11th Cir. 2019) ("[A] party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report." (internal cites and quotes omitted)).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  " "The party failing to comply with Rule 26(a)

bears the burden of establishing that its non-disclosure was either substantially justified or harmless.'" *Caviness v. Holland*, 2011 WL 13160390, at *2 (S.D. Ga. Mar. 17, 2011) (quoting *Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 683 (M.D. Fla. 2010)). "Substantial justification is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply." *Hewitt*, 268 F.R.D. at 682 (internal quotation marks and citations omitted). "[T]he appropriateness of a party's justification turns [at least in part] upon whether the party knew or should have known that an expert was necessary before the late stages of the discovery period." *Caviness*, 2011 WL 13160390, at *2 (quoting *Morrison v. Mann*, 244 F.R.D. 668, 673 (N.D. Ga. 2007)). As to the issue of harm, "[a] failure to timely make the required disclosures is harmless when there is no prejudice to the party entitled to the disclosure." *Hewitt*, 268 F.R.D. at 683.

Defendants argue Plaintiff has "abused Rule 26 in three ways." Doc. 86 at 5. They first argue that Plaintiff's "experts have supplied reports which do not disclose the all-important basis and reasons for each opinion." *Id.* Next, they argue that "each expert sought to bolster their

opinions by open-ended, improper supplementation." *Id.* Finally, they argue that "the experts disclosed the reasons and bases for their opinions for the first time in deposition," and that "the reasons and bases for the opinions of Crosson, Fletcher, and Galuk were materially supplemented *after* Defendants had completed their deposition examination, when Plaintiff's counsel could walk them through the various evidentiary materials that supposedly supported their opinions." *Id.* at 5-6.

In response, Plaintiff argues that his "experts permissibly elaborated on or supplemented the analysis, and none of the disclosed experts developed entirely new opinions." Doc. 94 at 24. He also suggests that even if the supplemental testimony ran afoul of Rule 26, it is still admissible because "any transgression was harmless under Rule 37." *Id.* (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007)) (internal quotes omitted). He contends the Defendants' counsel "was able to fully examine each expert on the basis of their opinion . . . ." Doc. 94 at 25. Since the timeline of the disclosures for each expert differs slightly, the Court will address each in turn, in the order utilized by the Defendants. *See* doc. 86 at 2-5.

1. **Joseph P. Crosson**

Joseph Crosson is an engineer specializing in "metallurgical and weld/fastener related structural failures, mechanical failures, ship casualty investigations, wire rope failures, materials testing, container crane failures and examination of container crane weldments." Doc. 86-3 at 1. His first report is dated September 4, 2020. *See* doc. 86 at 2 (citing doc. 86-3 (marked "Exhibit B")). It identified three opinions:

a. Based on my review of documents related to this case, it is my understanding that it is the duty of the crew of the COSCO Shipping Camellia to properly rig the gangway and regularly inspect each locking pin to make sure it is engaged;[1]

b. The locking pin which fell out of the railing/post connection on the left handrail must not have been inserted correctly. Because it was not inserted correctly or secured by turning the toggle bolt down to a vertical position, the locking pin did not lock and worked itself back out with vibration as people traveled up and down the gangway;

c. If the toggle bolt were defective itself, it should not have been re-inserted and still in use. This, in itself, should confirm the toggle bolt was not defective.

Doc. 86-3 at 2. The report went on to disclose the information considered by Crosson in forming his opinions: a Georgia Ports Authority ("GPA")

---

[1] Crosson abandoned this opinion during his deposition. *See* doc. 86-6 at 14.

Police Department incident report, photographs taken by the GPA Police Department, photographs taken by Plaintiff, photographs taken by Defendants' counsel, and the depositions of crew members Liu Jinlong and Jinzhao Li.  *Id.*  Although not challenging the timeliness of this initial report, Defendants argue it did not comply with Rule 26, since it did not identify the basis and reasons for Crosson's opinions as required by Rule 26(a)(2)(B)(i).  Doc. 86 at 3.  Whether Crosson's opinions are sufficiently supported is addressed in the discussion of Defendants' challenge under Federal Rule of Evidence 702 below.  For purposes of Defendants' Rule 26 challenge, Crosson's initial report passes muster.

Crosson issued a supplemental report on February 18, 2022, five days before his February 23, 2022 deposition.  *See* docs. 86 at 3; 86-4.  This supplement identified additional materials Crosson "considered" and stated that he "may use the same to elaborate upon, explain, and support [his] conclusions and testimony."  Doc. 86-4 at 1.  The additional materials include a video clip of the incident, the 30(b)(6) deposition of Defendants Shanghai Ocean Shipping Co., Ltd. and COSCO Shipping Camellia, Ltd., the depositions of Plaintiff, Keith Glover, and Sergeant

James Thomas, and the expert reports of Williams and Galuk.  *Id.* at 1-2.  The report did not expand on his opinions.  *See generally id.*

Defendants challenge this supplement on timeliness grounds, since all additional materials had been available no later than November 2021.  Doc. 86 at 3.  Although not ideal, Plaintiff's disclosure of these additional materials "considered" by Crosson was, at a minimum, harmless.  All materials identified appear to be items produced or created during discovery in this case.  *See* doc. 86-4 at 1-2.  Plaintiff alerted Defendants to the list in advance of the deposition, and Defendants' counsel was aware of the report—and thus Crosson's consideration of these discovery materials—during his questioning of Crosson.  *See, e.g.*, doc. 86-6 at 4 (defense counsel's discussion of Crosson's three expert reports); *compare Guevara*, 920 F.3d at 718 (affirming district court's exclusion of portions of untimely reports containing previously undisclosed industry standards where material was produced "on the eve of [the expert's] deposition" and where the expert "left his deposition after only three hours without the prior agreement of the parties.").

Crosson issued a second supplemental report on February 22, 2022.  *See* doc. 86-5.  This supplement disclosed that Crosson considered the

"COSCO SHIPPING CAMELLIA report on the Longshoreman Injury,"

along with a translated version of the report. *Id.* at 1. It further

explained:

> I remain convinced, to a reasonable degree of professional
> certainty, that the locking pin which came out was not
> correctly inserted or it was improperly secured. This problem
> directly led to the chain of events resulting in the fall. My
> conclusions are not only based on and supported by my
> reasonable, straightforward process of elimination, but it is
> further illustrated by the Vessel's own recently obtained
> report and labeled photographs with descriptions.

*Id.* at 2. It concluded: "My understanding that it is the duty of the crew

of the COSCO Shipping Camellia to properly rig the gangway and

regularly inspect each locking pin is consistent with these additional

documents reviewed and my own experience." *Id.* Defendants do not

object to the timeliness of this report, since it was based on their own late

disclosure of discovery materials, but they argue the supplement does not

explain "how Crosson actually used (if at all) any of the additional

materials." Doc. 86 at 3. Like the initial report, Defendants' criticism of

the bases for Crosson's opinions is discussed below in consideration of

their Rule 702 challenge.

Defendants argue that Crosson revealed for the first time the

"specific evidentiary material that formed the basis for his opinions"

during Plaintiff's counsel's questioning at his deposition. *Id.* (citing doc. 86-6).   They cite to five specific instances: discussion of video of the incident, doc. 86-6 at 24; discussion of a photograph attached to Crosson's original report, *id.*; discussion of Crosson's process of elimination methodology, *id.* at 23; discussion of a crew member's deposition testimony, *id.* at 26; and discussion of the 30(b)(6) deposition of Defendant COSCO Shipping Camellia, Ltd., *id.*   *See* doc. 86 at 3.

However, all of these materials were identified or referenced in at least one of Crosson's reports.   The photograph at issue was attached to the first report. *See* doc. 86-3 at 49-52.   The crew member deposition was identified in the first report. *See* doc. 86-3 at 2.   The video and the 30(b)(6) deposition were identified in the first supplemental report. *See* doc. 86-4 at 1.   The "process of elimination" was referred to, albeit implicitly, in the original report. *See* doc. 86-3 at 2 (discussing potential alternative cause for toggle bolt to fall out and eliminating it); *see also* doc. 86-5 at 2 (second supplemental report expressly discussing the "straightforward process of elimination).   There was, therefore, no improper supplementation that occurred during the deposition in violation of Rule 26.

Defendants' motion to exclude testimony or opinions of Crosson based solely on a purported violation of Rule 26 is **DENIED**.  Doc. 86, in part.

### 2.    Patricia Fletcher

Plaintiff's expert Patricia Fletcher has "14 years of experience in maritime vessel operations and safety" and is proffered "to testify regarding the responsibility of the ship's crew for the safety of the gangway . . . ."  Doc. 86-8 at 1.  She issued her expert witness report on August 28, 2020.  *See id.* at 4.  In it, she opines:

a. The gangway of the *COSCO Camellia* remains under the control of the vessel at all times and control of the gangway is never turned over to the stevedores or longshoremen;

b. It is the duty of the crew of the *COSCO Camellia* to properly rig the gangway and regularly inspect each locking pin to make sure it is engaged;

c. It is required that a crew member of the ship be posted at the gangway at all times to monitor people boarding and disembarking from the vessel, as well as to regularly monitor the gangway to ensure that it is safe and secure;

d. The locking pin which fell out of the railing/post connection on the left hand rail must not have been inserted correctly. Because it was not inserted correctly or secured by turning the toggle bolt down to a vertical position, the locking pin did not lock and worked itself back out with vibration as people traveled up and down the gangway.  This would have been obvious and easily detected and should have

been corrected immediately by the ship's crew member assigned to monitor the gangway;

e. It is the responsibility of the vessel's crew to keep third parties off of the gangway, until the gangway and all of its components are properly installed and secure;

f. Having the platform of the gangway over the water is acceptable only if an attachment plank is installed from the bottom of the gangway platform which extends over the dock; here it was not; and

g. The safety netting of the ship is supposed to be wrapped and secure around the gangway to prevent anyone from falling in the water.  The safety netting of the COSCO Camellia was improperly hanging and was not secured.

Doc. 86-8 at 1-2.  The report discloses the following as information Fletcher considered in forming her opinions: GPA Police Department incident report and photographs, photographs taken by the Plaintiff, photographs taken by Defendants' counsel, and the depositions of crew members Liu Jinlong and Jinzhao Li.  *Id.* at 2-3.

Like with Crosson, Defendants do not argue Fletcher's report was untimely under Rule 26, but suggest it violates the rule because it "did not disclose the basis for her opinions."  Doc. 86 at 3.  Whether Fletcher's opinion is properly supported is discussed below in consideration of Defendants' arguments under Rule 702.

Defendants next argue that Fletcher improperly identified the "evidentiary bases" for her opinions during Plaintiff's counsel's questioning at her deposition. Doc. 86 at 3-4. Two of Defendants' challenges have merit. During Plaintiff's counsel's questioning of Fletcher, she identified materials she reviewed that were not disclosed in her report: a "video," doc. 86-9 at 30, and "the 30(b)(6) deposition of the owner," *id.* at 31-32. Plaintiff offers no explanation for his failure to identify Fletcher's reliance on these materials prior to her deposition. *See* doc. 94 at 21-22, 24. Any testimony by Fletcher relying on these undisclosed materials is, therefore, excluded under Rule 37 as violative of Rule 26. *See Hamlett*, 176 F. Supp. 3d at 1365 ("It is unacceptable to make a party wait, and thus be surprised, at a deposition.").

Defendants' motion to exclude testimony or opinions of Fletcher based on Rule 26 and Rule 37 is, therefore, **GRANTED**, in part, and **DENIED**, in part. Doc. 86, in part.

### 3. Richard Galuk

Richard Galuk is offered as an expert in "[e]ngineering and failure analysis." Doc. 86-12 at 15. He issued his first report on July 12, 2020. *See* doc. 86-10 at 1. In it, he lists his "findings":

1. Ships (COSCO Shipping Camellia) gangway left hand handrail (on way down) collapsed as Mr. Romare Green used it for support.

2. As indicated in photograph 2 of this report, the lower section of gangway handrail collapsed due to becoming detached from upper section of handrail, which as indicated is still in the upright position.  Reason(s) for detachment are listed below:

> A. Failure of ship's crew to properly secure upper sections of handrail together.
>
> B. Failure of ship's crew to use proper components to secure upper sections of handrail together.
>
> C. Failure of ship's crew and/or its surveyors to perform proper maintenance, inspections and surveys related to ships gangway and related components.

Doc. 86-10 at 9.  He states, "it is my professional opinion based on my reasonable application of my experience to the subject matter that Mr. Romare Green's fall and related injuries are a direct result of the collapse of the upper handrail of ships gangway." *Id.*  As support for his findings and opinion, he identifies the GPA Police Department incident report, including supplements and statements, photographs taken at the accident scene, and the "International Maritime Organization (IMO) MSC.1/Circ. 1331 11 June 2009." *Id.* at 1-9.

In a supplemental report, Galuk identifies "additional case materials" he reviewed, including the deposition testimony of Liu Jinlong

15

and Jinzhao Li, photographs produced by the Defendants, a video clip of

the incident, and "Gard, Loss Prevention Circular No. 01-09." Doc. 86-11

at 1. Based on that review, he "submits the following to supplement [his]

prior report":

1. If the toggle lock clevis pin (or locking pin) had been inserted correctly and locked down properly by the ship's crew, the locking pin would not have worked itself out, which led to the collapse of the gangway handrail.

2. The crew member/"watchman" assigned to man the top of the gangway should have continued to monitor the condition of the gangway to make sure that the locking pins on the handrail remain secure.

3. Longshoremen or other non-crew members who need to embark or disembark the vessel should be able to rely on the vessels crew to continue to take the necessary steps to make sure the gangway and all component parts of the gangway are inspected, properly used and equipped along with making sure the safety netting is properly positioned, rigged and secured.

4. If there is too much slack, the safety netting would not be securely rigged as it should. The crew should continue to watch out for the level of slack to change as the tides change.

5. The gangway of the vessel remains the responsibility and under the control of the ship's crew. This concept is consistent with circulated industry publications and known practices . . . .

6. The safety netting should have been more securely rigged and properly checked. The photographs of the safety netting depict improperly rigged, tightened and insecure

16

> safety netting.  When properly rigged and secure, the
> safety netting would prevent a fall like the one Mr. Green
> had from becoming more severe and forcing him to cling on
> just below his shoulder.

Doc. 86-11 at 1-2.

Defendants do not challenge the timeliness of Galuk's original or supplemental reports.  Doc. 86 at 4.  They do argue that those reports failed to identify the basis or reasons for his opinions.  *Id.* (citing docs. 86-10 & 86-11).  As with Crosson and Fletcher, any deficiencies in the "basis or reasons" for Galuk's opinions will be addressed when considering the Defendants' challenge under Rule 702.

Defendants also argue that Plaintiff revealed during Galuk's deposition "other materials Galuk considered," including "evidentiary material the Plaintiff possessed for months, if not years."  Doc. 86 at 4. They challenge Plaintiff's counsel's questioning of Galuk about the deposition testimony of Liu Jinlong, *id.* (citing doc. 86-12 at 28), but Galuk noted his review of Jinlong's deposition testimony in his supplemental report, *see* doc. 86-11 at 1.  They point out Galuk's testimony about his prior experience traversing gangways as problematic, doc. 86 at 4 (citing doc. 86-12 at 31), but Galuk's report makes clear that he arrived at his opinions after a "reasonable

application of [his] experience to the subject matter," doc. 86-10 at 9, and his supplemental report discusses longshoremen and other non-crew members using the gangway to embark or disembark the vessel, doc. 86-11 at 1.   None of this deposition testimony violates the disclosure requirements of Rule 26.

Defendants also challenge Plaintiff's counsel's questioning of Galuk about whether a "broken" pin should be returned to service.  Doc. 86 at 4 (citing doc. 86-12 at 29).  This testimony was developed in conjunction with Plaintiff's counsel's questioning about Galuk's opinion that the "locking pin" or "toggle lock clevis pin" was not "inserted correctly" or "locked down properly," as compared to defective.  *See* doc. 86-12 at 29 (distinguishing "user error" from "mechanical error"); *see also* doc. 86-11 at 1 (identifying opinion that locking pin "would not have worked itself out" if it "had been inserted correctly and locked down properly by the ship's crew").  This exploration of Galuk's opinion does not warrant exclusion under Rules 26 or 37.  *See, e.g.*, *McPherson v. Rowe*, 366 F. App'x 43, 45-46 (11th Cir. 2010).

One of Defendants' Rule 26 challenges to Galuk's deposition testimony is valid.  As they point out, during Galuk's deposition

Plaintiff's counsel indicated his intent to "supplement by way of telling you" that Galuk considered additional materials, including "the 30(b)(6) deposition of COSCO SHIPPING LTD through Nancy Zhang with exhibits, deposition of Romare Greene with exhibits, Keith Glover and Sergeant Thomas with exhibits." Doc. 86-12 at 4. Plaintiff's counsel then questioned Galuk extensively about his review of Nancy Zhang's 30(b)(6) depositions. *Id.* at 29-30. These materials were not identified in either of Galuk's prior reports. *See* docs. 86-10, 86-11. Any testimony by Galuk relying on these materials is, therefore, excluded under Rule 37 as violative of Rule 26. *See Hamlett*, 176 F. Supp. 3d at 1365.

Defendants' motion to exclude testimony or opinions of Galuk based on Rule 26 and Rule 37 is, therefore, **GRANTED**, in part, and **DENIED**, in part. Doc. 86, in part.

### 4. William Williams

William Williams is offered as a "maritime safety expert." Doc. 86-13 at 1. His expert report contains 13 opinions:

    a. The gangway on the . . . *COSCO Camellia* stayed under the control of the vessel and control was not turned over to the stevedores or ILA crew or anyone else on the evening of February 17, 2020, when Romare Greene was injured;

b. It is the vessel's duty to properly rig the gangway and ensure the gangway is safe before any personnel use it. Once rigged for use, it is the vessel's continuing responsibility to periodically inspect the gangway to ensure all fasteners are properly engaged, and that the gangway remains safe for use.

c. Following Mr. Greene's accident, it was photo-documented that the securing pin used to inter-connect the gangway's left side handrails (left side while descending down to the pier) was not engaged. The securing pin appeared to be in good condition and was attached to the handrail assembly by a retaining wire. It is likely that the pin was not inserted after the handrails were raised into position, or the pin was not fully inserted as the gangway safety rails were erected, allowing it to back out and become disengaged. This was the job of the ship's crew on the *COSCO Camellia*. If inserted improperly, the pin would have the ability to work its way out of the retaining hole allowing the railing to become disengaged from the stanchion. This should have been detected and corrected;

d. It is the responsibility of the vessel's crew to keep third parties off of the gangway, unless the gangway and its components (pins, handrails and stanchions) are properly installed and verified;

e. Having the platform of the gangway over the water is problematic. This is acknowledged by its repositioning in the Pedigo photos. . . . The gangway should not be installed over the river as shown in the Port Police photos . . . and the Greene photos. . . .;

f. With the gangway suspended over the water as depicted in the exhibits, Mr. Greene would have had to use the safety handrail as he descended the ladder to the lower platform and turned to step on to the pier;

g.  Romare Green did nothing to cause his fall.  Someone using the gangway should keep at least one hand on the gangway handrail, as he did;

h.  The general method of storing and un-storing the gangway on a vessel such as the *COSCO Camellia*;

i.  The safety protocol for inspecting a gangway and its connecting pins;

j.  The netting configuration before and after Mr. Greene was pitched off the gangway as the handrail failed;

k.  The proper general method for the ship in investigating and documenting an incident such as that which occurred to Romare Greene;

l.  Rendering aid by the vessel to someone who was injured like Romare Greene;

m. Cooperation with the official investigation by the Port Police into the Greene incident[.]

Doc. 86-13 at 1-3.  He identifies the following as information he considered in formulating these opinions: photographs taken by Defendants' counsel, GPA police, and Plaintiff; the GPA police report; the depositions of crew members Liu Jinlong and Jinzhao Li; the "Safety of Life at Sea (SOLAS) II-1 3-9"; IMO Maritime Safety Committee (MSC) Circular 1331 (MSC.1/Circular 133.1) "Guidelines for Construction, Installation, Maintenance and Inspection/Survey of Means of Embarkation and Disembarkation"; and OSHA Regulations, 29 CFR 1918.22 (Gangways).  *Id.* at 3-4.

Defendants challenge Williams' initial report as violative of Rule 26 because some opinions are listed with no bases or reasons provided, and some opinions are not opinions at all. As with the three prior experts, whether Williams' opinions are properly supported will be addressed below when analyzing Defendants' challenges under Rule 702. However, as the Defendants point out, some of his "opinions" are not opinions at all, but "are simply topics." Doc. 86 at 4. Topics (h) through (m) do not identify any opinion, and certainly do not identify the bases or reasons for the non-existent opinions. *See* doc. 86-13 at 3. He could not, as Plaintiff insinuates, elaborate on, or supplement, an opinion that does not exist. *See* doc. 94 at 24. Any attempt to formulate the relevant opinions, or first convey those opinions during his deposition is improper. *See Hamlett*, 176 F. Supp. 3d at 1365. Plaintiff does not offer any argument as to why this specific failure to identify any actual opinions is excusable. *See generally* doc. 94. Any testimony about these "topics" is, therefore, excluded pursuant to Rules 26 and 37.

In a supplemental report, provided two days before his deposition, Williams identified additional materials he consulted: the "COSCO SHIPPING CAMELLIA report on the Longshoreman Injury" from the

date of the incident; a video from the incident; the 30(b)(6) depositions of Shanghai Ocean Shipping Co., LTD and COSCO Shipping Camellia, Ltd.; and the depositions of Romare Greene, Keith Glover, and Sergeant James Thomas.   Doc. 86-14 at 1-2.   Defendants do not object to the late disclosure of the report, *see* doc. 86 at 5, but do object to "the supplemental disclosure of material in Plaintiff's possession for months."  *Id*.   Again, Plaintiff is not to be commended for the last-minute revelation of additional materials considered by his expert.   However, at bottom, the late disclosure was harmless.   The materials were all things produced or created during the discovery period in this case.   *See* doc. 86-14 at 1-2. They are not accompanied with any change in opinion, or any new opinions.  *Id*.   Defendants' counsel was in possession of the list before the beginning of the deposition.   *See* doc. 86-15 at 5 (Defendants' counsel: "I know about the documents, Mr. Williams, that you have referenced in your report, and either I already have them or [Plaintiff's counsel] has given them to me.   Is there anything that is not listed in either of your two expert reports that is responsive to [a document request]?" Answer: "No . . ."). Williams' testimony about opinions (a) through (g) will not be

excluded solely on Rule 26 grounds for the untimeliness of the supplemental report.

Defendants' motion to exclude testimony or opinions of Williams based solely on a purported violation of Rule 26 is **GRANTED**, in part, and **DENIED,** in part. Doc. 86, in part. Any testimony on "topics" (h) through (m) is **EXCLUDED** pursuant to Rule 37.

## B.     Federal Rule of Evidence 702

Because each of Plaintiff's experts survive Defendants' Rule 26 challenges, with some limited exceptions related to particular materials relied upon by Fletcher and Galuk and Williams' impermissible "topics," the Court now turns to what Defendants identify as the "primary issue": whether these experts meet the threshold requirements of Rule 702. Doc. 103 at 2. Rule 702 compels the Court to act as a "gatekeeper" for expert evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n. 7, 597 (1993)). In performing this task, the Court must consider whether the party offering the evidence has shown:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence.  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n.10).[2]

Under the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61; *see also* Fed. R. Evid. 702 (a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]").   But, "[w]hen an expert witness relies mainly on

---

[2] In his response to Defendants' *Daubert* challenge, Plaintiff suggests that his experts are qualified and their opinions reliable because, among other reasons, "the Vessel Defendants here have not presented a single expert witness to explain or testify concerning any subject." Doc. 94 at 4 (emphasis in original omitted); *see also id.* at 6 ("Although the Defendants had ample opportunity to offer primary or rebuttal expert testimony, the only expert testimony in this case is unrebutted."). As the Eleventh Circuit explained in *Allison*, it is Plaintiff's burden to lay the proper foundation for the admission of his proposed experts.  184 F.3d at 1306.  Therefore, the Court considers whether Plaintiff has met that burden, irrespective of the Defendants' decision to not name any experts.

experience to show he is qualified to testify, 'the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942-43 (11th Cir. 2015.) (quoting *Frazier*, 387 F.3d at 1261).

As to the second prong, the reliability "criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261. "The Supreme Court in *Daubert* set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors, or observations, inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id.* (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.3d at 1262. "Indeed, the Committee Note to the 2000 Amendments of

Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* at 1261.

Lastly, expert testimony must assist the trier of fact. *Frazier*, 387 F.3d at 1262. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* (citation omitted). This inquiry is commonly called the "helpfulness" inquiry. *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (citing *Frazier*, 387 F.3d at 1260). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting *Daubert*, 509 U.S. at 591).

Defendants seek exclusion of all the opinions of all four experts. *See* doc. 86 at 8-25. For ease of reference, the Court will address each expert in the order followed above.

### 1.    Crosson

Before weighing the merits of the parties' arguments about Crosson's opinions, it is important to establish what those opinions are.

Crosson issued three expert reports, docs. 86-3, 86-4, & 86-5, two of which contain opinions, *see* docs. 86-3 & 86-5.  He then abandoned some of his opinions during his deposition.  *See* doc. 86-6 at 14 (testifying that he will not offer an expert opinion about the duties of the vessel's crew).  The remaining opinions are, from his first report:

> The locking pin which fell out of the railing/post connection on the left handrail must not have been inserted correctly. Because it was not inserted correctly or secured by turning the toggle bolt down to a vertical position, the locking pin did not lock and worked itself back out with vibration as people traveled up and down the gangway.

> If the toggle bolt were defective itself, it should not have been re-inserted and still in use.  This, in itself, should confirm the toggle bolt was not defective.

Doc. 86-3 at 2.  And from his second report:

> I remain convinced, to a reasonable degree of professional certainty, that the locking pin which came out was not correctly inserted or it was improperly secured.  This problem directly led to the chain of events resulting in the fall.  My conclusions are not only based on and supported by my reasonable, straightforward process of elimination, but it is further illustrated by the Vessel's own recently obtained report and labeled photographs with descriptions.

Doc. 86-5 at 2; *see also* doc. 86 at 17-18; doc. 94 at 11 (conceding location of crew member "at top of gangway" is "not a subject where [Crosson] will offer expert opinions").

Defendants argue these opinions should be excluded "for the simple reason they are not backed by any methodology whatsoever." Doc. 86 at 20. Although Defendants do not challenge his qualifications, or his opinions' helpfulness, *see id.*, Plaintiff robustly argues that Crosson is "a highly qualified expert" who offers reliable, helpful opinions. Doc. 94 at 11-19. Considering Defendants "did not challenge his qualifications," *see* doc. 103 at 6, the Court agrees with Plaintiff that Crosson is qualified. There is also no suggestion that his testimony would not be helpful. As Defendants put it, the "crux of the issue is whether Crosson should be able to render a causal opinion (that the incorrect insertion of the locking pin caused it to come out) . . . ." *Id.*

Turning, then, to the prong of the *Daubert* analysis where there is a dispute. Defendants argue Crosson's "opinions about a pin he has had never seen, tested, or examined" are unreliable, because "[i]n essence, [he] relies entirely on the fact that the pin came out to establish that it was installed incorrectly." Doc. 86 at 18-19. They critique his opinion that the "locking pin . . . must not have been inserted correctly" because it is based on his observation, through post-incident photographs, that the pin did not exhibit any fracture or failure of any component and on

the fact that the crew reused the pin. *Id.* at 18. They characterize his methodology as "rel[ying] entirely on the fact that the pin came out to establish that it was installed incorrectly." *Id.* They also critique his opinion that, if defective, the toggle bolt/locking pin should not have been reinserted and still in use. *Id.* at 19. It is problematic, according to Defendants, because Crosson has no relevant experience, did not perform any testing, did not review any relevant treatises, did not inspect the vessel or the gangway, did not take any measurements, and "has not attempted to figure out how long it might have taken the pin to work its way out." *Id.*

In response, Plaintiff argues that Crosson's process of elimination methodology is reliable, that he did not need to personally inspect the vessel or the pin to render his opinions, and that Defendants can raise any concerns with his methodology through cross-examination. Doc. 94 at 17.[3]   Crosson, similar to the experts in cases cited by Plaintiff,

---

[3] Plaintiff relies heavily on Crosson's deposition testimony, during Plaintiff's counsel's questioning, that his opinions are helpful, that he is qualified, and that he has "used a level of intellectual rigor that [he] would expect to see from others recognized in the field." *See* doc. 94 at 12-13 (quoting doc. 86-6 at 24-25). Calling this "unrebutted evidence," Plaintiff suggests that because Crosson says his opinions are methodologically sound, the opinions survive the *Daubert* challenge. *Id.* That is not the case. "A district court cannot simply accept that an opinion is reliable because

"reviewed the substantial universe of discovery in this case and formed his conclusions by applying relevant [engineering] standards gleaned from his years of experience . . . ." *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *3 (N.D. Ga. 2021).   His "process of elimination is an acceptable methodology in the scientific and engineering communities." *Auto-Owners Ins. Co. v. Uniden Am. Corp.*, 503 F. Supp. 2d 1087, 1093 (E.D. Wis. 2007) (collecting cases); *see also Rothschild v. Great Northern Ins. Co.*, 2022 WL 11204272, at *7-8 (S.D. Fla. Oct. 18, 2022) (finding a "process of elimination" sufficiently reliable, because while the opposing party disagreed with that methodology, "the issue for a *Daubert* methodology challenge is not what it was possible for an expert to do, but rather what it was reasonably necessary for an expert to do in order for his opinions to be reliable." (internal citation and quotations omitted)); *Brown v. Kia Motors Corp.*, 2009 WL 866846, at *5 (W.D. Penn. March 30, 2009) (finding a process of elimination sufficiently reliable under *Daubert*).

---

the expert says that his methodology is sound."   *United States v. Azmat*, 805 F.3d 1018, 1041 (11th Cir. 2015) (citing *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014)).  Despite Crosson's testimony, the Court must still analyze whether his opinions are reliable under *Daubert* and Rule 702.

Defendants also critique Crosson's performance of this methodology, because he relied on a visual inspection of photographs of the locking pin and the gangway, and not on any actual testing or inspection. *See, e.g.,* doc. 103 at 9-10. In conducting his process of elimination, "[w]hat materials [Crosson] consulted, and to what extent, goes to the weight and credibility of his testimony, not to its admissibility." *Desert Falcon-Special Maritime Enterprise v. East Coast Terminal Co.*, 2004 WL 5612966, at *2 (S.D. Ga. Jan. 5, 2004). The weight to be given to admissible expert testimony is a matter for the jury. *See Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . . Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (quoting *Daubert*, 509 U.S. at 596)); *see also Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 989-990 (11th Cir. 2016) (reversing district court's exclusion of expert testimony as unreliable). Therefore, if Defendants "believe[ ] there are flaws in [Crosson's]

generally reliable methodology, that is precisely the role of cross-examination." *Handley v. Werner Enter., Inc.*, 2022 WL 229891, at *3 (M.D. Ga. Jan. 25, 2022) (internal citations and quotations omitted).

For these reasons, Defendants' motion to exclude Crosson's opinions is **DENIED**.  Doc. 86, in part.

### 2.   Fletcher

Fletcher' report explains that she has 14 years of experience in "maritime vessel operations and safety," including as a marine operations superintendent, port manager, vessel agent, and vessel planner.  Doc. 86-8 at 1.  As a reminder, she opines:

  a. The gangway of the *COSCO Camellia* remains under the control of the vessel at all times and control of the gangway is never turned over to the stevedores or longshoremen;

  b. It is the duty of the crew of the *COSCO Camellia* to properly rig the gangway and regularly inspect each locking pin to make sure it is engaged;

  c. It is required that [two] crew member[s] of the ship be posted at the gangway at all times to monitor people boarding and disembarking from the vessel, as well as to regularly monitor the gangway to ensure that it is safe and secure;[4]

---

[4] Fletcher modified her opinion during her deposition, which originally stated that there should be one member of the crew stationed atop the gangway.  *See* doc. 86-9 at 22.

33

d. The locking pin which fell out of the railing/post connection on the left hand rail must not have been inserted correctly. Because it was not inserted correctly or secured by turning the toggle bolt down to a vertical position, the locking pin did not lock and worked itself back out with vibration as people traveled up and down the gangway. This would have been obvious and easily detected and should have been corrected immediately by the ship's crew member assigned to monitor the gangway;[5]

e. It is the responsibility of the vessel's crew to keep third parties off of the gangway, until the gangway and all of its components are properly installed and secure;

f. Having the platform of the gangway over the water is acceptable only if an attachment plank is installed from the bottom of the gangway platform which extends over the dock; here it was not; and

g. The safety netting of the ship is supposed to be wrapped and secure around the gangway to prevent anyone from falling in the water. The safety netting of the COSCO Camellia was improperly hanging and was not secured.

*Id.* at 1-2. Defendants argue she is unqualified to render these opinions, and the opinions are unreliable and unhelpful. Doc. 86 at 16-17.

Defendants first attack Fletcher's opinions (a), (b), (c), and (e), arguing "[t]hey are not the product of any methodology whatsoever and are not clearly linked to her experience or indeed to any facts of this case."

---

[5] Fletcher's report confusingly contains two letter "c" paragraphs in its list of her opinions. *See* doc. 86-8 at 2. This Order modifies the numbering of that list so that there are no duplicative letters.

Doc. 86 at 16-17.  They criticize opinion (d)—identified as the second opinion (c) in the report—as "the product of no rigorous methodology or even applied expertise." *Id.* at 17.  They also argue that she is unqualified to render each of these opinions, since she has "never worked on a vessel or in cargo operations" and lacks "any other applied experience on cargo vessels." *Id.*  Finally, they challenge opinions (f) and (g) as "not relevant to any issue of consequence in this case." *Id.*

Defendants summarize that Fletcher's opinion (a) is based on her former supervisors telling her that the gangway remains under the vessel's control "due to liability factors," and based on "common sense." *Id.* at 15 (citing doc. 86-9 at 21).  Although she remembers receiving training through her employer that the vessel is responsible for the gangway, she can identify no authoritative materials supporting her conclusion.  Doc. 86-9 at 21.  She bases this opinion on her general understanding, through her supervisors at a former job, that "we [the stevedores] are responsible for the cargo going on and off the vessel, but anything to do with the physical ship, we never get on it." *Id.*

Defendants also challenge Fletcher's opinion (b), which, they summarize, is based on "prior discussions she's had with chief officers

and unidentified documents she was previously handed by unidentified chief officers on unidentified ships indicating crew duties on those vessels." *Id.* (citing doc. 86-9 at 22). They point out that "[s]he has no idea if similar instructions or documents were given before the cargo operations underlying this case." *Id.* Similarly, they argue opinions (c) and (e) "originate[ ] entirely from some unnamed and unidentified shipping company manual allegedly given to the chief officer and the vessel," but she "admits that she has not seen the COSCO CAMELLIA's manual, has not seen such a manual since leaving Ports America, does not know what such manuals say today, and does not currently have on in her possession." *Id.*; *see also id.* at 16 ("Opinion [(e)] is also based entirely on the manuals Fletcher alleges to have seen but cannot identify."). She also suggests that the crew members must be stationed at the top of the gangway because of a Customs and Border Protection security requirement, but then concedes she could not opine that there is "a rule that requires the ship to have two crew members stationed at the top of the gangway." Doc. 86-9 at 16.

Fletcher's opinion (d)—referred to by Defendants as "second opinion (c)"—is also problematic. She opines that the locking pin "must not have

been inserted correctly," causing it to "work[ ] itself back out with vibration as people traveled up and down the gangway." Doc. 86-8 at 2. In support of this opinion, she testified that she "made presumptions" and reviewed websites showing the "tide charts" to, in her words, "see what the water was doing and the currents were doing, to see if any of that caused it." Doc. 86-9 at 24. Defendants refer to this second basis as "absurd." Doc. 86 at 17. Whether or not it is absurd, it does reflect an absence of methodology, application of experience, or any other indicia of reliability.

Plaintiff's response does not include any argument directly in support of any specific opinion, instead referring generally to Fletcher's experience "working on Vessels during cargo operations as a vessel superintendent for several years." *See* doc. 94 at 21-22. Plaintiff refers to Fletcher's testimony that the vessel is "responsible for that gangway at all times," including the "safety of the gangway," *id.* at 22 (citing doc. 86-9 at 31) but does not explain how her experience supports that conclusion, *see id.* Plaintiff also refers to Fletcher's testimony that, in her experience, "there is typically at least one member of the ship's crew based at the top of the gangway." *Id.* (citing doc. 86-9 at 16). However,

her observation of crew members stationed atop the gangway does not fully explain or support her opinions that the gangway remains under the control of the vessel, that the crew is obligated to rig the gangway and regularly inspect it and its component parts, that a member of the crew must be stationed on the gangway at all times to, among other things, regularly monitor it to ensure that it is secure, or that it is the crew's responsibility to keep third parties off of the gangway until it is secure.  Plaintiff's response does not touch, at all, Defendants' argument about opinion (d).  *Id.*  Plaintiff falls short of explaining how Fletcher's experience "leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Frazier*, 387 F.3d at 1261 (internal citation and quotation omitted).  Nothing in Fletcher's background suggests she has the experience to opine on the cause of the locking pin's failure.  *See generally* doc. 86-8 at 82-83.  Plaintiff has not carried his burden to demonstrate that these opinions are reliable.

Defendants also challenge Fletcher's opinions (f) and (g) as irrelevant and therefore unhelpful.  *See* doc. 86 at 17.  These opinions relate to the safety netting underneath the gangway and the positioning

of the gangway platform.  *See* doc. 86-8 at 2.  The Court rejected Plaintiff's attempt to amend his pleadings to add a negligence claim related to the netting.  *See* doc. 51 at 7-8, 13.  Plaintiff does not contest Defendants' argument that these two opinions are irrelevant.  *See* doc. 94 at 21-22.  It does not appear, then, that the opinions regarding the safety netting are relevant to an issue in this case and are therefore unhelpful.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").  Plaintiff has not met his burden relative to Fletcher's opinions (f) and (g).

All of Fletcher's opinions are **EXCLUDED**.  Defendants' motion to exclude Fletcher as an expert witness is, therefore, **GRANTED**.  Doc. 86, in part.

### 3.   Galuk

Galuk is proffered as an expert in engineering and failure analysis. *See* doc. 86 at 8 (quoting doc. 86-12 at 15).  Defendants challenge his qualifications and the reliability and helpfulness of his opinions.  *Id*. at 8-13.  As a reminder, in his supplemental report Galuk offered six opinions:

1. If the toggle lock clevis pin (or locking pin) had been inserted correctly and locked down properly by the ship's

crew, the locking pin would not have worked itself out, which led to the collapse of the gangway handrail.

2. The crew member/"watchman" assigned to man the top of the gangway should have continued to monitor the condition of the gangway to make sure that the locking pins on the handrail remain secure.

3. Longshoremen or other non-crew members who need to embark or disembark the vessel should be able to rely on the vessels crew to continue to take the necessary steps to make sure the gangway and all component parts of the gangway are inspected, properly used and equipped along with making sure the safety netting is properly positioned, rigged and secured.

4. If there is too much slack, the safety netting would not be securely rigged as it should.  The crew should continue to watch out for the level of slack to change as the tides change.

5. The gangway of the vessel remains the responsibility and under the control of the ship's crew.  This concept is consistent with circulated industry publications and known practices . . . .

6. The safety netting should have been more securely rigged and properly checked.  The photographs of the safety netting depict improperly rigged, tightened and insecure safety netting.  When properly rigged and secure, the safety netting would prevent a fall like the one Mr. Green had from becoming more severe and forcing him to cling on just below his shoulder.

Doc. 86-11 at 1-2.  As Defendants explain, this supplemental report "subsumed" Galuk's original opinions.  *Compare id. with* doc. 86-10 at 9;

*see also* doc. 86 at 9.  Plaintiff does not challenge this assertion.  *See* doc. 94 at 22-23.

Defendants first challenge Galuk's qualifications.  Doc. 86 at 8-13. They argue he "lacks experience with container vessels," *id.* at 8, and therefore should be excluded as an expert on cargo vessel operations, *id.* at 12.  In support, they cite to two cases from this Court excluding Galuk "from rendering testimony related to incidents occurring on cargo vessels[.]"  *Id.* at 9 (citing *Barton v. Hai Feng 1710 Designated*, 2021 WL 704320, at *3 (S.D. Ga. Feb. 23, 2021); *Mosley v. Ceres Marine Terminals, Inc.*, 2021 WL 6931813, at *4 (S.D. Ga. Aug. 27, 2021)).  They explain "Galuk's experience has not meaningfully changed" since these cases were decided and point out he has no prior experience inspecting container ship equipment or overseeing cargo operations, no prior employment aboard container ships or as a stevedore or longshoreman, no prior performance of a maritime survey of a container ship, and no prior training on "gangway operations."  Doc. 86 at 10-11.

Plaintiff responds that the subject matter here is different from the subject matter in *Barton* and *Mosley*, and that "Galuk has experience working with, examining, and even making repairs to gangway

handrails." Doc. 94 at 22 (citing doc. 86-12 at 11, 20). He further argues that Galuk has "personally 'rigged gangways himself,' and witnessed others rigging a gangway." *Id.* at 23 (quoting doc. 86-12 at 20). Even when excluding Galuk as unqualified in *Mosley*, this Court recognized his "long history working with marine vessels," and his educational background at the Coast Guard's engineering school. 2021 WL 6931813, at *3-4. Distinguishing this case from the prior cases where he was deemed unqualified, Galuk testified that gangways on non-cargo vessels are "consistent" with the gangways on cargo vessels like the one at issue here. Doc. 86-12 at 30. Considering the cases cited by Plaintiff discussing the "relatively low threshold for qualification," Plaintiff has satisfactorily shown that Galuk is "minimally qualified" to testify regarding the gangway. *See Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012).

While Galuk may be qualified to opine about the gangway, that does not mean his experience can necessarily support each of his opinions. *See Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021) (identifying "conceptual distinction between an expert's qualifications and the reliability of his proffered opinion." (internal citation and

quotations omitted)).   The reliability inquiry requires a more "exacting analysis" than the qualification inquiry.   *Id.*   Defendants challenge opinions 1, 2, 3, and 5 as unreliable.   *See* doc. 86 at 12-13.

In opinion 1, Galuk presumes that "[i]f the toggle lock clevis pin (or locking pin) had been inserted correctly and locked down properly by the ship's crew, the locking pin would not have worked itself out, which led to the collapse of the gangway handrail."   Doc. 86-11 at 1; *see also* doc. 86-10 at 9 (opining that the "[r]eason(s) for detachment" include the "[f]ailure of ship's crew to properly secure upper sections of handrail together" and the "[f]ailure of ship's crew to use proper components to secure upper sections of handrail together.").   Defendants argue this opinion is improper *ipse dixit* since it is "based solely on Galuk's say so and [is] not the product of any specialized expertise, exacting analysis, or sufficient methodology."   Doc. 86 at 12.   They cite to his deposition during which he speculates, "[i]f [the pin] is put in properly, it is not going to come out until you physically take it out."   *Id.* at 10 (citing doc. 86-12 at 20).   When pressed, Galuk identifies no testimony, video, photographs, or other documentary evidence supporting his opinion.   *Id.*   He did review photographs of the pin and handrail taken after the incident, but not

43

prior to the incident.  *Id.*  He did not perform any tests or rely on any apparent methodology to form his conclusion.  *Id.*  In fact, in response to Defendants' counsel's question about whether he had "rul[ed] out other possible causes of the pin coming out of the handrail," he appeared to scoff at the idea that "ruling out" any other cause was necessary.  Doc. 86-12 at 20.

Plaintiff bears the "substantial burden" of laying the proper foundation for the admission of Galuk's testimony.  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).  In response to Defendants' challenge, Plaintiff refers only to Galuk's familiarity with "[t]he concepts applicable to customary and safe gangway operations . . . through his career and education with the Coast Guard and since that time."  Doc. 94 at 23.  Experience can support a reliable opinion; however, Plaintiff must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Frazier*, 387 F.3d at 1261 (emphasis omitted).  "[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering

reliable any conceivable opinion the expert may express." *Id*. While, as discussed above, Galuk does appear to have significant maritime experience, Plaintiff fails to connect that specific experience with this specific opinion about the cause of the locking pin's failure. *See* doc. 94 at 22-23. When asked what part of his education is relevant to his opinions in this case, he identified going through a "process of elimination" to "determine[e] why . . . something went wrong, something broke, something fell," doc. 86-12 at 9, but Plaintiff does not point to any materials that explain Galuk's process of elimination in this case. *See* doc. 94 at 22-23; *see also generally* doc. 113. His own testimony suggests he did not engage in such a process. *See* doc. 86-12 at 20.

Although not specifically in relation to Galuk's first opinion, Plaintiff generally argues that his experts, including Galuk, "provided sufficient indicia of reliability regarding his methods" such that his testimony should not be inadmissible. *See* doc. 94 at 23-24; doc. 113 at 7. There are no "sufficient indicia of reliability" for Galuk's first opinion. Instead, it relies on Galuk's unsupported conclusion that "[i]f [the pin] is put in properly, it is not going to come out until you physically take it out." Doc. 86-12 at 20. "If admissibility could be established merely by

the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Id.*; *see also Jones v. Anderson*, 2018 WL 2717221, at *7 (S.D. Ga. June 6, 2018). Plaintiff's citation in his sur-reply to *Seamon,* 813 F.3d at 983, does not compel a different result. Doc. 113 at 6-7. In *Seamon*, the Eleventh Circuit reversed the district court's exclusion of a plaintiff's expert as unreliable, finding that it was "evident from the record that [the expert] did in fact provide a reasonable explanation as to why he has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury." 813 F.3d at 989. Although citing *Seamon*, Plaintiff does not identify *any* explanation from Galuk, much less a reasonable one, as to how he formulated his first opinion. *See* doc. 94 at 22-23; doc. 113 at 4-7.

Without any further explanation of Galuk's methodology or of his application of his experience to formulate his first opinion, other than a reference to a "demonstrative" he had fabricated without any indication of how it supports his conclusion, *see* doc. 94 at 22, Plaintiff has not met their burden of establishing the reliability of Galuk's first opinion. It is, therefore, **EXCLUDED**.

Defendants similarly argue that Galuk's second, third, and fifth opinions are unreliable. *See* doc. 86 at 12. They summarize the second opinion as "merely criticiz[ing] the crew for presumably failing to inspect the locking pin to ensure that it was working properly at the time of the incident," and argue that Galuk "does not know whether it was inspected or not," and "is not familiar with any document or custom requiring regular inspection of a gangway after it is rigged and while berthed." *Id.* at 10. The third opinion, they argue, is "apparently entirely drawn from a GARD circular that is of an origin unknown to Galuk, that he had no role in preparing, that had not been issued to him, and does not actually say that longshoremen are entitled to rely on the crew." *Id.* at 11 (citing doc. 86-12 at 22-23). They similarly argue that opinion 5 is an "improper legal opinion" based "entirely on circulars that do not stand for what Galuk claims they do." *Id.* at 13. His reliance on an International Maritime Organization circular is also a problem, according to Defendants, because it discusses vessel construction, not inspections during ongoing cargo operations. *Id.* Plaintiff does not directly respond to any of these meritorious challenges. *See* doc. 94 at 22-23; *see generally*

doc. 113.  Having failed to meet his burden to demonstrate the reliability of these three opinions, they are **EXCLUDED**.

Defendants finally challenge Galuk's opinions 4 and 6 as irrelevant and therefore unhelpful.  *See* doc. 86 at 13.  These opinions relate to the safety netting underneath the gangway.  *See* doc. 86-11 at 1-2.  The Court rejected Plaintiff's attempt to amend his pleadings to add a negligence claim related to the netting.  *See* doc. 51 at 7-8, 13.  It does not appear, then, that the opinions regarding the safety netting are relevant to an issue in this case and are therefore unhelpful.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").  Because Plaintiff has not met his burden of showing these opinions are helpful and relevant, they opinions are **EXCLUDED**.

Because all Galuk's opinions are excluded, Defendants' motion to exclude Galuk as an expert is **GRANTED**.  Doc. 86, in part.

### 4.  Williams

Williams identifies himself as a "maritime safety expert" with 27 years of experience in the United States Navy, experience consulting on "port safety," and prior employment as the "Vice President of Health,

Safety & Environment for A.P. Moller-Maersk's operations in the Americas." Doc. 86-13 at 1. He was retained by Plaintiff to "testify regarding the safety of the gangway which collapsed." *Id.* His remaining opinions, after excluding those addressed above as improperly disclosed, are:

a. The gangway on the *COSCO Camellia* stayed under the control of the vessel and control was not turned over to the stevedores or ILA crew or anyone else on the evening of February 17, 2020, when Romare Greene was injured;

b. It is the vessel's duty to properly rig the gangway and ensure the gangway is safe before any personnel use it. Once rigged for use, it is the vessel's continuing responsibility to periodically inspect the gangway to ensure all fasteners are properly engaged, and that the gangway remains safe for use.

c. Following Mr. Greene's accident, it was photo-documented that the securing pin used to inter-connect the gangway's left side handrails (left side while descending down to the pier) was not engaged. The securing pin appeared to be in good condition and was attached to the handrail assembly by a retaining wire. It is likely that the pin was not inserted after the handrails were raised into position, or the pin was not fully inserted as the gangway safety rails were erected, allowing it to back out and become disengaged. This was the job of the ship's crew on the *COSCO Camellia*. If inserted improperly, the pin would have the ability to work its way out of the retaining hole allowing the railing to become disengaged from the stanchion. This should have been detected and corrected;

d. It is the responsibility of the vessel's crew to keep third parties off of the gangway, unless the gangway and its

      components (pins, handrails and stanchions) are properly installed and verified;

e. Having the platform of the gangway over the water is problematic.  This is acknowledged by its repositioning in the Pedigo photos. . . . The gangway should not be installed over the river as shown in the Port Police photos . . . and the Greene photos. . . .;

f. With the gangway suspended over the water as depicted in the exhibits, Mr. Greene would have had to use the safety handrail as he descended the ladder to the lower platform and turned to step on to the pier;

g. Romare Green did nothing to cause his fall.  Someone using the gangway should keep at least one hand on the gangway handrail, as he did[.]

*Id.* at 1-3. Defendants do not appear to directly challenge Williams' qualifications to render any of the opinions.  *See* doc. 86 at 21-25.  However, they argue all his opinions should be excluded because they are unreliable and, in some cases, unhelpful.  Doc. 86 at 24-25.  They also argue that opinions (a), (b), and (d) "conflict with appliable law because they purport to impose duties on Defendants that are over and above those imposed under [the applicable case law]." *Id.* at 24.

    Williams' opinions (a), (b), and (d) all relate to the duty of the vessel relative to the gangway before "personnel" or "third parties" use it.  *See* doc. 86-13 at 1-2.  The parties agree this case is governed by the Longshore and Harbor Workers' Compensation Act (LHWCA).  *See* docs.

84 at 7-8; 97 at 10-11.  Therefore, "the duties a shipowner or charterer owes to longshoremen under the LHWCA" are governed by the Supreme Court's decision in *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 163 (1981).  Williams' attempts to opine as to the vessel or crew's obligations—or, as he puts it, "duties" or "responsibilities"—relative to the Plaintiff, a longshoreman, are therefore legal conclusions. "It is well settled that experts are not permitted to offer legal conclusions as opinions."  *Romano v. John Hancock Life Ins. Co. (USA)*, 2022 WL 1447733, at *1 (S.D. Fla. May 9, 2022).

Plaintiff attempts to side-step this prohibition by explaining " '[d]uties' or 'duty' in the vernacular of many maritime professionals or seamen refers to the job responsibilities or industry standard and custom, rather than a legal duty."  Doc. 94 at 20, n. 20.  Plaintiff also cites to *Pacinelli v. Carnival Corp.*, *id.* at 20 for the general proposition that expert testimony on industry standards may be helpful when a concept is "beyond the common knowledge of the average [layperson]."  2019 WL 3252133, at *6 (S.D. Fla. July 19, 2019).  But reliance on *Pacinelli* fails him.  In fact, the *Pacinelli* court excluded portions of the expert's testimony at issue because, like here, it was "interspersed with

impermissible legal conclusions." *Id.* As in *Pacinelli*, Plaintiff's explanation, which does not include any citation to the record or to any relevant legal authority, is unavailing. Any testimony from Williams as to the duties or obligations owed by the vessel to Plaintiff relative to the gangway are, therefore, **EXCLUDED**.

Williams' opinion (c) is comparable to Crosson's opinions. He reviewed the evidence in this case, including photographs, and based on his experience with gangways eliminated various potential causes of the pin's failure. Doc. 86-13 at 2. His methodology is sufficiently reliable to satisfy Rule 702 and *Daubert*. Defendants critique the opinion, including Williams' suggestion that the crew inserted the locking pin improperly, since Defendants contend the facts support a different conclusion. Defendants can continue to challenge the opinion, including attacking its factual basis, on cross-examination. *See Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341.

Next is Williams' opinion (e) which relates to the positioning of the gangway platform at the time of Plaintiff's fall. *See* doc. 86-13 at 2-3. Williams calls the positioning "problematic," but his deposition testimony explains that this is based on "common sense." Doc. 86-15 at 23. He is

unable to identify any industry standard to support his "common sense" opinion. *Id.* He also conceded, during his deposition, that the applicable regulations contemplate positioning the gangway over the water. *Id.* at 23-24. This opinion is unreliable, as it is based on nothing more than Williams' preference. Plaintiff does not appropriately explain how Williams' experience, applied to the facts, provides support for this opinion. It is, therefore, **EXCLUDED**.

Finally come opinions (f) and (g), which discuss Plaintiff's use of the handrail while disembarking the ship on the gangway. Doc. 86-13 at 3. Williams has sufficient experience relative to disembarking gangways, and teaching others to safely disembark gangways, that he may opine on the propriety of the way in which Plaintiff traversed the gangway here.

For these reasons, Defendants' motion to exclude Williams' opinions is **GRANTED, in part**, and **DENIED, in part**. Doc. 86, in part

C.   **CONCLUSION**

Defendants' Motion to Exclude is **GRANTED, in part**. Doc. 86, in part. Plaintiff's experts Patricia Fletcher and Richard Galuk are **EXCLUDED** entirely. Williams' topics (h), (i), (j), (k), (l), and (m) are **EXCLUDED** for violations of Federal Rule of Civil Procedure 26. *See*

doc. 86-13 at 3.  Williams' opinions (a), (b), (d), and (e), and any related testimony, are **EXCLUDED**.  *Id.* at 1-3.  The remainder of the Motion to Exclude is **DENIED**.  Doc. 86, in part.

      **SO ORDERED** this 15th day of February, 2023.

                    CHRISTOPHER L. RAY
                    UNITED STATES MAGISTRATE JUDGE
                    SOUTHERN DISTRICT OF GEORGIA