## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

|  |  |
|---|---|
| ROMARE J. GREENE, | |
| Plaintiff, | CIVIL ACTION NO.: 4:20-cv-00091 |
| v. | |
| COSCO SHIPPING LINES CO. LTD.;<br>COSCO SHIPPING CAMELLIA LTD; and<br>SHANGHAI OCEAN SHIPPING CO. LTD, | |
| Defendants. | |

## <u>O R D E R</u>

This is a negligence case that arises out of injuries allegedly sustained by Plaintiff Romare Greene while he was working as a longshoreman aboard the M/V COSCO Shipping Camellia ("the Vessel") on February 17, 2020. (See doc. 1-1.) Presently before the Court is Defendants Cosco Shipping Lines Co. Ltd., Cosco Shipping Camellia LTD, and Shanghai Ocean Shipping CO. LTD's[1] Renewed Joint Motion for Summary Judgment, in which they argue, *inter alia*, that they did not owe a duty of care to Plaintiff and that his injuries were caused by the negligence of his fellow longshoremen. (Doc. 126.) Defendants additionally bring a Motion for Partial Summary Judgment as to Plaintiff's claim for future lost earnings. (Doc. 82.) Also before the Court is Ancillary Defendants' separate Motion for Summary Judgment, in which they argue that, as time charterer and ship management company, respectively, they are not proper parties to this suit.

---

[1] Henceforth, the Court refers to Defendant Cosco Shipping Lines Co. Ltd. as "CSL," to Defendant Cosco Shipping Camellia LTD as "Cosco," and to Defendant Shanghai Ocean Shipping Co. LTD as "Shanghai Ocean." The Court refers to these defendants collectively as "Defendants." Additionally, the Court refers to CSL and Shanghai Ocean together as "Ancillary Defendants."

(Doc. 80.)  The Motions have been fully briefed by the parties.  (See docs. 80, 82, 95, 98, 106, 126, 130, 132, 138.)

For the reasons stated herein, the Court **DENIES** Defendants' Renewed Motion for Summary Judgment, (doc. 126), **GRANTS** Ancillary Defendants' Motion for Summary Judgment, (doc. 80), and **GRANTS** Defendants' Motion for Partial Summary Judgment as to Plaintiff's claim for future lost earnings, (doc. 82).

## BACKGROUND

### I.    The Parties

At all relevant times, Plaintiff was employed as a longshoreman through Ports America.[2] (Doc. 126-6, p. 13.)  On the day of the events giving rise to this lawsuit, Plaintiff was working as a longshoreman aboard the Vessel.  (Doc. 96, p. 1.)

Defendant Cosco was the owner of the Vessel at the time of the incident.  (Doc. 81, p. 1; doc. 98-1, p. 1.)  Non-party COSCO (Cayman) Mercury Co. Ltd. first "time-chartered" the Vessel from Cosco pursuant to a time charter agreement (the "Time Charter").[3]  (Doc. 81, p. 2; doc. 98-1, p. 1.)  Defendant CSL thereafter subchartered the vessel pursuant to a subcharter agreement (the "Subcharter").  (Doc. 81, p. 2; doc. 98-1, p. 1.)  Specifically, the Time Charter contained a clause which provided:

> The Master shall perform the voyages with due despatch, and shall render all customary assistance with the Vessel's crew.  The Master shall be conversant with the English language and (although appointed by the Owner) shall be under the

---

[2]  While it is not material to the Court's determinations in this Order, the Court notes, for context purposes, that Ports America is an independent stevedore company that provides stevedoring services to vessels.  See Container Terminal Operator and Stevedore, Ports America, https://www.portsamerica.com/ operations/services-containers, (last visited Aug. 18, 2023).

[3]  "A time charter agreement is a contract of affreightment to use a ship in order to ship goods for a specific time period under which the carrier makes the ship's capacity available to the time charterer for such purpose."  Roberson v. Seaspan Corp., 521 F. Supp. 3d 1325, 1329 n.2 (S.D. Ga. 2021) (citing Thomas J. Schoenbaum, 2 Admiralty & Maritime Law, § 11:5 (6th ed. 2018)).

> orders and directions of the Charterer as regards employment and agency; and the Charterer shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk and expense, under the supervision of the Master.

(Doc. 80-3, p. 3, ¶ 8(a).)  Defendant Shanghai Ocean, the ship management company, contracted to provide certain services to COSCO (Cayman) Mercury Co. Ltd., through a ship management agreement (the "Ship Management Agreement").  (Doc. 81, p. 2; doc. 98-1, p. 1.)  Neither the Time Charter nor the Ship Management Agreement contains any assumption of responsibility for duties owed to others.  (Doc. 81, p. 3; doc. 98-1, p. 1.)

## II.    Factual Background[4]

The incident giving rise to this suit occurred on February 17, 2020, while Plaintiff was working as a longshoreman aboard the Vessel.  (Doc. 96, p. 1.)  During cargo operations, longshoremen embark and disembark the ship via a "gangway." (See doc. 126, p. 2.)  Once a ship is docked, the ship's gangway is lowered and the handrails on either side are raised and fastened in the middle by a pin, which ensures that the handrails cannot draw apart and collapse.  (Id.; see doc. 126-8, p. 9.)  The pin has a toggle, or a locking pin, which serves to prevent the pin from working itself back out of the handrail.  (Doc. 126, pp. 2–3; doc. 126-8, p. 9.)  It is the job of the Vessel's crew to rig the gangway before cargo operations begin so that longshoremen can embark

---

[4]  The Southern District of Georgia's Local Rule 56.1 provides that a party moving for summary judgment under Federal Rule of Civil Procedure 56 shall annex to the motion "a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof."  S.D. Ga. L.R. 56.1.  Defendants neglected to file such a statement for their renewed Motion and instead rely on their Statement of Undisputed Facts and Conclusions of Law accompanying their original motion for summary judgment, (doc. 85).  This earlier submission—as well as Plaintiff's Response thereto—contains a very abbreviated version of the facts, largely centering on the parties' disagreements regarding who installed the gangway immediately before Plaintiff's fall and contains little information regarding the incident itself.  (See generally docs. 85, 96.)  As the pertinent facts were not all laid out by the parties as required by L.R. 56.1, the Court has attempted to parse through the record and fill in the gaps.  At times, the necessary information used to lay out the factual background was taken from descriptions or passing references in the parties' briefing that appear to be undisputed.

and disembark the Vessel.  (Doc. 130-1, pp. 44–46.)[5]  Additionally, the Vessel's crew members are provided with operational and maintenance rules on how to properly handle the gangway.  (Id. at p. 22.)  Cosco additionally requires a watchman from the crew to supervise the gangway to ensure it stays safe pursuant to any potentially changing conditions.  (Id. at pp. 47, 104–05.)

On February 17, 2020, the Vessel's crew rigged the gangway before cargo operations began.  (Doc. 126, p. 4.)  Shortly after the longshoremen began embarking the Vessel via the gangway, at approximately 19:06 hours, the gangway's handrail collapsed.  (Id. at p. 5; doc. 105, at 19:06:07 (depicting the handrail first collapsing)[6].)  No longshoremen were injured in this incident.  (Doc. 126-11, p. 2 (testimony stating that the collapse "nearly injure[d]" the longshoremen present on the gangway").)

According to David Frizzell, who was working as a longshoreman and was present during the first handrail collapse, the longshoremen first attempted to get the attention of a ship's mate to inform him of the problem and then worked to put the handrail back in place.  (Id. at p. 2.)  Frizzell stated that when two members of the Vessel's crew (or "mates") arrived at the top of the gangway, Frizzell alerted them of the incident and his belief that there was a problem with the locking pins.  (Id. at pp. 2–3.)  According to Frizzell, one of the mates then assured him that he was correcting the problem and would check all the pins, and that the mate then descended the gangway.  (Id. at p. 3.)

---

[5]  The requirements that Cosco imposed concerning the Vessel and the crew aboard it were outlined by Zei "Nancy" Whang during her deposition on behalf of Cosco.  (See generally doc. 130-1); Fed. R. Civ. P. 30(b)(6).

[6]  Defendants submitted a thumb drive of video evidence taken from the Georgia Ports Authority which partially depicts the gangway at issue in this case.  (Doc. 126, p. 5; see generally doc. 105.)  Plaintiff has not disputed the contents or the legitimacy of the video.

Consistent with Frizzell's testimony, video evidence depicts a collapse of the handrail around the same time referred to by Frizzell.[7]  (Doc. 105, at 19:06:07.)  Following the collapse, the video depicts a group of longshoremen congregating around the collapsed handrail while a mate descends the gangway.  (Id. at 19:06:07–19:06:30.)  The mate then supervises the process of the longshoremen raising the gangway rail into place.  (Doc. 126, pp. 5–6 ("The mate has descended and is inspecting the pin with [the] longshoremen."); see doc. 105, 19:06:30–19:06:47.)  Once the handrail is seemingly raised into place, the video appears to depict the mate leaning over the handrail to inspect the pin before ascending the gangway to the Vessel.  (Doc. 105, 19:06:42–19:06:50; see also doc. 126 (describing the video as showing the mate "tak[ing] one more look [at] . . .  the gangway" while the longshoremen stand by).)  After the first handrail collapse, other longshoremen continue to embark and disembark the Vessel via the gangway, but, according to Defendants' description of the video, no Vessel crew member was again present on the gangway until after Plaintiff's fall.  (Doc. 126, p. 8; see generally doc. 105, 19:06:50–19:29:00 (depicting around twenty individuals ascending and descending the gangway).)

Thereafter, at around 19:29–19:30 hours,[8] Plaintiff descended the gangway and, as he reached the bottom landing, the handrail again collapsed, causing him to fall onto the dock below.  (Doc. 126, p. 9; doc. 130, p. 11.)  After this second handrail collapse, a mate re-raised the gangway's handrail into place.  (Doc. 126, pp. 9–10.)  The parties agree the handrail collapsed

---

[7] The video depicts the handrail collapsing at 19:06, (doc. 105, at 19:06:07), and Frizzell claims the handrail collapsed "at approximately 19[:]00," (doc. 126-11, p. 2).

[8] Defendants contend that the second collapse occurred "at approximately 19:29–19:30 hrs," (doc. 126, p. 9), while Plaintiff contends it occurred "around 19:34," (doc. 130, p. 11).  While the video evidence does not clearly depict Plaintiff's fall (as the bottom of the gangway is not in the frame), the video nevertheless appears to corroborate Defendants' timeline.  (See doc. 105, 19:29:00–19:29:30 (depicting a longshoreman descending the gangway and reaching the bottom); id. at 19:30:15–19:31:55 (depicting crew members inspecting the handrail in the area of the collapse).)

because a locking pin came out of place.  (Doc. 94, p. 2; doc. 86, p. 2.)  However, the parties disagree as to what caused the pin to fall out.  Plaintiff maintains that the pin was negligently installed, and that this negligence is attributable to the Vessel's crew.  (See doc. 130, pp. 10–11; doc. 26-8, p. 21.)  Defendants simply maintain that they do not know what caused the pin to fall out, but that the installation, and thus any negligent installation of the pin, is solely attributable to the longshoremen.  (Doc. 126, pp. 4–5.)

That same evening, following Plaintiff's fall, the Vessel issued a written report, which concluded that "due to the gangway shaking or unintentional bumping when workers were ascending and descending, a front safety latch on the outboard dock side of the railing was opened, causing this pin to fall out."  (Doc. 86-14, p. 12.)  The report further stated that "[a]n inspection found that this latch and safety were somewhat loose, and both sides have been bound with a small rope."  (Id.)

### III.   Plaintiff's Claim for Future Lost Earnings

After the incident, Plaintiff underwent surgery and spent months in recovery before he was released back to full-time work on July 26, 2020, by his doctor, Dr. Robert Dow Hoffman.  (Doc. 82-2, pp. 23–25; doc. 82-4, pp. 9–10.)  Since this date, Plaintiff has returned to work as a longshoreman, (doc. 95-1, p. 2), and he has never been instructed by Dr. Hoffman, or by any other doctor, to limit his work hours, (doc. 82-2, p. 25).  While Plaintiff performed and continues to perform many different roles, he typically selects the job of "lasher," which entails securing or unsecuring a container from the deck of a ship by tightening or loosening twist locks using a rod. (Doc. 95-1, pp. 2–3.)  Since his injury, Plaintiff continues to work out three to four times a week, though he claims that he cannot lift the amount of weight that he previously could due to pain from

his injury.  (Id. at p. 3; doc. 82-2, p. 8.)  Additionally, Plaintiff testified that he experiences pain from his injuries when he lifts rods in his job as a lasher.  (Doc. 82-2, p. 8, 24.)

According to Plaintiff, before the incident, he normally worked around ten to fifteen hour shifts a day, seven days a week.  (Doc. 95-1, p. 3; doc 82-2, p. 8.)  Plaintiff admits that he actually works *more* hours since returning to work after the injury than he did before the injury, which has resulted in increased wage earnings post-injury as compared to prior to the injury.  (Doc. 95-1, pp. 8–9; see doc. 82-5.)   According to Plaintiff, his increase in hours post-injury is the result of increased job opportunities for longshoremen.  (Id. at p. 8; doc. 82-2, p. 28.)  He testified that before his injury, he "tr[ied] to work as many hours as possible every week," and that, if he did not experience pain from his injury, he believes he would be able to work upwards of 120 hours a week, or at least 15 more hours per week.  (Doc. 82-2, p. 24, 27.)  Plaintiff claims, however, that he must limit the hours he works despite the increase in available work hours because of the pain he experiences.  (Id. at p. 8 ("[H]e is unable to work as much as he would in this time of booming work.  The increase in [Plaintiff's post-injury] hours is due to the increased work GPA is experiencing, not Plaintiff's alleged lack of pain and physical limitations.").)  Plaintiff claims past and future lost wages in his initial disclosure by estimating "lost wages in the amount of $19,750.00 per month based on his annual earnings for the past three complete years worked" but provided no support for how he calculated this number.  (Doc. 82-6, p. 4.)

## IV.   Procedural History

Plaintiff originally brought suit under 28 U.S.C. § 1333, general maritime law, and Georgia law against Defendants in the State Court of Chatham County, alleging that all Defendants were responsible for the collapse of the handrail.  (Doc. 1-1.)  Defendants thereafter removed the case to this Court.  (Doc. 1.)

After discovery was complete, the Defendants collectively filed a motion for summary judgment, arguing, *inter alia*, that the collapse of the gangway's handrail was a result of actions by longshoremen, not the actions of the Vessel's crew, and thus none of the Defendants could be held liable.  (See generally doc. 84.)  Plaintiff filed a response, in which he argued, *inter alia*, that the crew was responsible for the negligent installation of the pin which caused the handrail to collapse and that, furthermore, the crew had a duty to monitor the gangway and discover that the pin was improperly installed.  (Doc. 97.)  At the time of filing this motion for summary judgment, Defendants contemporaneously filed a motion to exclude Plaintiff's experts, Crosson, Fletcher, Galuk, and Williams.  (Doc. 86.)  The Magistrate Judge entered an Order excluding Fletcher and Galuk entirely and excluding certain portions of Williams's testimony (but denying the motion as to Crosson).  (Doc. 119.)  Both parties objected, and this Court thereafter affirmed the Magistrate's ruling.  (Doc. 124.)  Because both the original motion for summary judgment and Plaintiff's response in opposition depended heavily on the presumed exclusion or inclusion of such expert opinions, the Court directed the Defendants to submit a renewed motion and for the parties to provide renewed briefing.  (Doc. 124.)  In compliance with the Court's Order, Defendants thereafter timely filed their Renewed Joint Motion for Summary Judgment.  (Doc. 126.)  Plaintiff then timely filed a Response, (doc. 128), and Defendants thereafter filed a Reply, and a Renewed Reply, (docs. 132, 138).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted).

**DISCUSSION**

I.    **Defendants' Motion for Summary Judgment Under the Longshore and Harbor Workers' Compensation Act**

Typically, when a longshoreman sustains an injury within the course of his employment, the "longshoreman's employer—in most instances, an independent stevedore—must pay the statutory benefits regardless of fault."  Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 96 (1994) (citing 33 U.S.C. §§ 904, 905(a)) (internal citation omitted).  However, under Section 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), an injured longshoreman may also seek damages from a third-party vessel owner if the vessel owner negligently caused the longshoreman's injuries.  33 U.S.C. § 905(b); Seaboard Spirit Ltd. v. Hyman, 672 F. App'x 935, 939–40 (11th Cir. 2016).

However, a vessel owner is not held liable for every act of negligence that occurs within the course of cargo operations on a vessel.  33 U.S.C. § 905(b).  Instead, a vessel owner is only liable for its own acts of negligence, and the longshoreman has no recourse against the vessel "if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel"—i.e., other longshoremen.  33 U.S.C. § 905(b).  Furthermore, the vessel owner is entitled to rely on the stevedore "to avoid exposing the longshoremen to unreasonable hazards," and may otherwise expect the stevedore to "perform his task properly without supervision." Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 170 (1981).  Indeed, "absent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations."  Id. at 172.  However, under the LHWCA, shipowners do owe three distinct duties, known as the "Scindia duties," which include: (1) the "turnover duty," which relates to the condition of the vessel upon the commencement of

10

stevedoring operations; (2) the "active control duty" to exercise reasonable care to prevent injuries in areas over which the vessel retains control once stevedoring operations have begun; and (3) the "duty to intervene" in the stevedore's operations, even in areas under the principal control of the independent stevedore, when the vessel owner has actual knowledge of a hazard of which the stevedore cannot be relied upon to remedy.  See Howlett, 512 U.S. at 98–100; see also Scindia, 451 U.S. at 167–76; Roach v. M/V Aqua Grace, 857 F.2d 1575, 1581 (11th Cir. 1988).

Defendants move for summary judgment, arguing, *inter alia*, that Plaintiff's injuries resulted from negligence of his fellow longshoremen, and that the vessel owed no duty to Plaintiff under any of the Scindia duties.  (Doc. 126, pp. 16–23.)  Plaintiff, in his Response, argues that Defendants misconstrue the relevant evidence which shows the Vessel was responsible for the gangway collapse, and that Defendants thereby breached each of the Scindia duties.  (Doc. 130, pp. 13–30.)

### A.   Turnover Duty

Under the first Scindia duty, the turnover duty, "a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety, and must warn the stevedore of any hidden dangers of which it knows or should know."  Roach, 857 F.2d at 1581.  Critically, both the turnover duty of safe condition and the turnover duty to warn "relate to the condition of the ship *upon commencement of stevedoring operations,"* which means that "a breach of the turnover duty must occur at the moment of turnover." Mosley v. Ceres Marine Terminals, Inc., 576 F. Supp. 3d 1358, 1365 (S.D. Ga. 2021) (emphasis added).

While the parties dispute who is responsible for the pin coming out and causing the handrail to collapse, Plaintiff seems to concede that, after the start of stevedore operations, the handrail had already collapsed once and had been re-raised (meaning the pin had been re-inserted) prior to

Plaintiff's fall.  (See doc. 130, p. 25 (relying on first handrail collapse as evidence that the crew appreciated the hazardous condition).)  Accordingly, Defendants argue that the re-raising of the handrail, and the allegedly negligent installation of the pin thereto, was a separate event occurring *after* the ship had already been turned over to the stevedore, and therefore the turnover duty is not implicated.  While this could ultimately prove to be true, there is also evidence which indicates that a problem with the handrail existed at the commencement of stevedore operations, and persisted after the first handrail collapse.  Plaintiff argues that the Vessel, "*from the outset*[,] . . . fail[ed] to secure the components of the gangway."  (Doc. 130, p. 28 (emphasis added).)  To support this contention, Plaintiff points to the Vessel's inspection on the night of the incident, which revealed that "a front safety latch on the outboard dock side of the railing was opened, causing this pin to fall out."  (Doc. 86-14, p. 12.)  The incident report further states that after inspection, the Vessel discovered "that this latch and safety were somewhat loose," and, thereafter, "tightly fastened" all the latches "to prevent similar accidents from occurring."  (Id.)  It is undisputed that the Vessel's crew rigged the gangway prior to the commencement of stevedore operations, yet did not locate and remedy any potential hazard with the gangway.  Accordingly, because Plaintiff argues that the problem which caused the pin to fall out existed from the outset, and because there is at least some evidence to support such a theory, the Court cannot say, as a matter of law, that the turnover duty was not breached.

**B.    Active Control Duty**

Plaintiff primarily argues that Cosco is liable under the active control (or active operations) duty.  (See doc. 130, pp. 20–27.)  Under the active control or operations duty, once cargo operations are underway, a vessel may be held liable (1) "if it actively involves itself in the cargo operations and negligently injures a longshoremen," or (2) "if it fails to exercise due care to avoid

exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." <u>Scindia</u>, 451 U.S. at 167. To trigger the "active control duty" or the "active operations duty," a plaintiff must show that the vessel owner "substantially controlled or was in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the [longshoremen] undertook." <u>Washington</u>, 374 F. Supp. 3d at 1357. If the vessel is actively involved in operations or actively controls the area, "the shipowner may be held liable if it has 'constructive knowledge' of a hazard." <u>Green v. United States</u>, 700 F. Supp. 2d 1280, 1297-98 (M.D. Fla. 2010) (quoting <u>Lampkin v. Liberia Athene Transp. Co., Ltd.</u>, 823 F.2d 1497, 1501 (11th Cir. 1987), <i>aff'd</i>, 418 F. App'x 862 (11th Cir. 2011) (per curiam).

In this case, Plaintiff does not argue that the Vessel's crew actively engaged in cargo operations but rather that the gangway was under the "active control of the [V]essel" when Plaintiff was injured. (Doc. 130, p. 20.) Thus, the issue ultimately is who substantially controlled or was in charge of (i) the area in which the hazard existed (i.e., the gangway) and (ii) the instrumentality which caused the injury (i.e., the pin which allegedly caused the handrail to collapse).

### (1)  Triggering the Active Control Duty

The Court finds that there is sufficient evidence in the record to create a question of fact as to whether the active control duty was triggered. The vessel required crew members to monitor the gangway. (Doc. 130-1, p. 47 (testimony from Cosco's 30(b)(6) representative acknowledging that "there must be a gangway watchman from the crew who is watching and making sure the gangway stays safe").) The superintendent for the stevedoring company, Brandi Bouie, testified that on the night of the incident she was told that "the [V]essel's gangway watchman, chief officer,

or another vessel mate would be continuously monitoring the gangway for safety issues."[9]  (Doc. 130-3, p. 2.)  Indeed, by Cosco's own admission, it is "customary . . . in the maritime industry" for the crew to monitor the gangway while longshoremen are embarking or disembarking the vessel. (Doc. 130-1, pp. 84–85; id. at p. 22 (describing operation and maintenance of the gangway to be the "job of the crew member").)  The Vessel additionally maintained operational and maintenance rules, which charge the crew with rigging the gangway before cargo operations begin and ensuring it continues to function properly.  (Id. at pp. 22, 45–46.)

This arrangement regarding monitoring of the gangway is consistent with myriad caselaw from other circuits finding that maintenance of the gangway falls within a vessel's control.  See, e.g., Sarauw v. Oceanic Nav. Corp., 655 F.2d 526, 528 (3d Cir. 1981) (finding a gangway to be, "when put in place, a basic appurtenance of the vessel" which triggered the vessel's duty "to exercise reasonable care with respect to the gangway's being properly secured to the vessel and maintained in safe condition for use"); Romero Reyes v. Marine Enters., 494 F.2d 866, 870 (1st Cir. 1974) ("The owner is thus liable for a negligent failure to inspect a gangway and to warn against defects reasonably apparent from inspection or to take steps to repair or replace it."); Nelson v. United States, No. 3:19-CV-01761-HZ, 2021 WL 5864012, at *2 (D. Or. Aug. 4, 2021) ("Defendant does not dispute that the gangway was under 'active control of the vessel.'"); Mayer v. Lykes Bros. S.S. Co., 585 F. Supp. 1222, 1226 (E.D. La. 1984) ("It is undisputed that

---

[9]  The Court notes that the objection that Defendants have made regarding the admissibility of certain testimony given by Bouie does not apply to the testimony relied upon by the Court here.  (Doc. 126, pp. 12–13 n.3 (objecting to Bouie's testimony regarding the first collapse and the re-raising of the gangway for her alleged failure to establish personal knowledge).)  This testimony is based on personal knowledge gained during a meeting she had with the Chief Officer of the Vessel on the date of the at-issue incident. (See doc. 130-3, p. 2.)

[defendant-vessel] retained control over the only means of access to the vessel [(the gangway)] on the day in question, and that the gangway was not involved in any [cargo] operation at that time.").

Defendants argue there is no genuine dispute as to whether the active control duty was triggered due to video evidence that they claim shows "only longshoremen using the gangway and also that the longshoremen were in control of the equipment that allegedly led to the handrail collapsing." (Doc. 126, p. 21.) However, the Court does not find the video evidence to be so conclusive. Indeed, the video, as Defendants concede, shows a crew member approaching the longshoremen immediately after the first collapse to supervise the re-rigging process. (See doc. 105, 19:06:30–19:06:47; see also doc. 126, p. 6 (describing the mate as "inspecting the pin")). A reasonable viewer of the video could deduce that the crew member was in charge and actively instructing the longshoremen on how to proceed with re-installing the handrail (as evidenced through his hand motions directing the longshoremen and the fact that he is the only individual depicted leaning over the rail to inspect the pin). (Doc. 105, 19:06:30–19:06:47.) Moreover, even if the Court is to accept Defendants' argument that the presence of these longshoremen indicates that they exerted control over the gangway, this does not preclude "concurrent control" by the Vessel crew. See Green, 700 F. Supp. 2d at 1303 (citing Lampkin, 823 F.2d at 1502) (noting that the active control duty "does not require Defendant's exclusive control; concurrent control is sufficient to invoke the broader duty of care").

In response, Defendants argue that "the simple presence of supervisory personnel" is "[in]sufficient to constitute the type of active involvement and control that would trigger the ship's liability." (Doc. 126, p. 22 (quoting Miller, 685 F. App'x at 755) (internal quotations omitted).) In Miller, the court found that the mere presence of a port captain on the vessel to observe loading did not rise to the level of control needed to "create a duty based on active involvement with cargo

operations." Id. at 756.  Likewise, Defendants cite to Green v. United States, where the court found the active operations duty was not triggered because the crew only performed various progress checks, and no "members of the . . . crew were involved" at the time the injury occurred. 700 F. Supp. 2d at 1303.  These cases do not sway the Court.  The gangway was not an area where longshoremen were actively engaged in cargo operations, but a mere means of accessing the ship, and there is evidence that the Vessel's crew members were required to stay on the gangway specifically to ensure it remained safe.

Plaintiff has submitted evidence that goes well beyond that of mere supervisory presence and weighs in favor of finding the active operations duty was triggered.  See, e.g., Ross v. United States, No. 3:10-CV-496-J-37-JBT, 2012 WL 523631 (M.D. Fla. Feb. 16, 2012) (finding genuine issue of material fact existed as to whether the defendant-vessel "substantially controlled" the hatch which caused plaintiff's injury as it was "charged with policymaking regarding use of the hatches" as well as their maintenance, and the contractors were supposed to report any problems regarding the hatches to the crew); accord Davis v. Portline Transportes Mar. Internacional, 16 F.3d 532 (3d Cir. 1994) (finding relevant crew members' testimony that it was customary for the vessel, and not the stevedore, to remove slippery conditions from the deck in finding a genuine issue of material fact existed regarding the active control duty).  Accordingly, there is sufficient evidence to give rise to a genuine issue of material fact as to whether the gangway remained "under the active control of the vessel."  Scindia, 451 U.S. at 167.

### (2)    Breach of the Active Control Duty

Defendants further argue that "even assuming control," Plaintiff cannot establish a breach of the active control duty because he cannot show that the vessel "created the hazardous condition, or knew it was present but negligently failed to remedy it, or should have known of the hazard

because it was in existence for such a period of time that it should have been discovered." (Doc. 126, p. 22 (quoting Lampkin, 823 F.2d at 1502).) Defendants argue that Plaintiff's entire theory for breach is that Defendants negligently replaced the locking pin, which they argue the record has disproven. (Id.) The Court disagrees.

Even if the active operations duty was triggered, Plaintiff still must show evidence that such a duty was breached. See Mosley, 576 F. Supp. 3d at 1368 ("If the active control duty is triggered, there is still a question of whether the defendant breached the active control duty."). A plaintiff may establish that the active control duty was breached by showing that "the shipowner . . . ha[d] 'constructive knowledge' of a hazard." Green, 700 F. Supp. 2d at 1297–98 (quoting Lampkin, 823 F.2d at 1501); Chapman v. Bizet Shipping, S.A., 936 F. Supp. 982, 986 (S.D. Ga. 1996) ("The . . . active operations duty[] applies only when the shipowner has constructive knowledge of the potential danger."). The Court finds that there is a genuine issue of material fact regarding whether the Vessel had constructive knowledge of the hazard that led to Plaintiff's injuries.

While it is unclear what exactly caused the handrail to collapse a second time, the parties seem to agree that it happened because the handrail's locking pin came out. (See doc. 86-14, p. 12; doc. 130, pp. 6–7.) Plaintiff's primary theory is that the pin was negligently installed before the handrail collapse that caused his injuries. (Doc. 130, pp. 6–7; see doc. 86-3, p. 2.) Plaintiff has submitted admissible expert testimony that, before the handrail's second collapse, the pin "must not have been inserted correctly."[10] (Doc. 86-3, p. 2; doc. 86-13, p. 2 (concluding that the

---

[10] In a prior order, the Magistrate Judge deemed Williams's opinion (c) from his expert report, concerning his conclusion that the locking pin was improperly installed, to be admissible. (Doc. 119, p. 52.) The Magistrate Judge additionally concluded that Crosson's opinion concluding the same was admissible. (Id. at pp. 27–33.) This Court then affirmed the Magistrate Judge's ruling and overruled the parties' objections thereto. (Doc. 124.)

pin "was not fully inserted as the gangway safety rails were erected, allowing it to back out and become disengaged"); see also doc. 126-8, p. 20 (finding "the only conclusion you can make is that the pin was never inserted correctly in the first place" and discounting the possibility that the pin worked itself out without improper installation).)  If the fact finder believes Plaintiff's experts' theory that the pin was negligently inserted, then it could further reasonably find that the Vessel crew member who checked the pin's installation (as the video evidence arguably depicts (see doc. 105, 19:06:30–19:06:47)) should have appreciated that the pin was improperly inserted.  This position is further bolstered by Frizzell's testimony that he believed there was a problem with the locking pin after the first collapse and he advised a crew member, who, according to Frizzell, "assured [him] that he was correcting the problem."  (Doc. 126-11, p. 3.)  Moreover, the handrail had just collapsed within minutes of stevedore operations commencing, which could be reasonably viewed to have put the crew on alert that the handrail needed to be inspected when it was re-raised. Taken together, this creates a genuine issue of material fact as to whether the crew had constructive knowledge of the hazard.  See Gilmore v. Honesty Ocean Shipping Corp., No. 8:14-CV-2633-T-35JSS, 2017 WL 11001719, at *3 (M.D. Fla. Feb. 8, 2017) (visible defect in area under the vessel's control provided basis for constructive knowledge of the hazard); cf. Lampkin, 823 F.2d at 1503 ("[T]here is no evidence that the crew had been [in the area of plaintiff's fall] and had had the opportunity to gain constructive knowledge of [the hazardous condition].").

    **C.**    **Duty to Intervene**

       Additionally, Plaintiff argues that the Vessel breached the duty to intervene because it was notified that the gangway's handrail had collapsed yet failed to adequately remedy the problem. (Doc. 130, pp. 29–30.)  A shipowner has a duty to intervene and protect longshoremen even in areas not under its active control if "[the shipowner] becomes aware that the ship or its gear poses

a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen." Purvis v. Ceres Marine Terminals, Inc., No. 4:17-cv-211, 2019 WL 1928498, at *6 (S.D. Ga. Apr. 30, 2019), aff'd sub nom., Purvis v. Maersk Line A/S, 795 F. App'x 756 (11th Cir. 2020). Thus, the duty to intervene is triggered only when a shipowner "has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of obviously improvident judgment, has failed to remedy it." Miller, 685 F. App'x at 757. A shipowner exercises "obviously improvident" judgment by using equipment "so hazardous that anyone can tell that [the equipment's] continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account." Dixon v. NYK Reefers Ltd., No. 8:15-CV-1806-T-23JSS, 2016 WL 5719477, at *2 (M.D. Fla. Sept. 30, 2016), aff'd, 705 F. App'x 819 (11th Cir. 2017). Moreover, even if the defendant has actual knowledge, there must be evidence "that the defendants were actually aware that an unreasonable risk of harm was created by the condition." Mosley v. Ceres Marine Terminals, Inc., No. 4:19-cv-216, 2021 WL 5056583, at *9 (S.D. Ga. Nov. 1, 2021) (internal quotations omitted). Furthermore, "[t]he duty to intervene is an exceedingly narrow one and only the most egregious decisions by the stevedore are 'obviously improvident.'" Miller, 685 F. App'x at 757 (internal quotations omitted).

The Court finds that Plaintiff has submitted sufficient evidence to raise a genuine issue of material fact on the duty to intervene. As previously discussed, according to the testimony of David Frizzell, he believed there to be a problem with the locking pin holding up the handrail. Based on this belief, he testified that he notified crew members who assured him they would address the issue. (Doc. 126-11, pp. 2–3.) While Defendants dispute that this notification actually occurred, if the factfinder were to believe Frizzell, it could find that the crew members had both knowledge of a hazardous condition (a problem with the locking pin, as it had already come out

once) and knowledge that it would pose a risk to longshoremen (as the crew watchman was aware that longshoremen were continuing to embark and disembark the vessel). While the Court acknowledges that some of the details in Frizzell's testimony are not directly corroborated by what is depicted on the video, the Court nevertheless finds this to be a credibility issue, not a reason to reject Frizzell's testimony outright.[11] See Ayers v. Harrison, 650 F. App'x 709, 712 n.2 (11th Cir. 2016) (finding that security footage did not "blatantly contradict" the non-moving party's version of events, and that "[e]ven with the video, the jury still had to make numerous and critical factual findings, including some based on credibility choices"). While the discrepancies between Frizzell's testimony and the video footage may ultimately persuade the factfinder to discount or give less weight to his testimony, the Court cannot say that an issue with the accuracy of Frizzell's description of his movements would be sufficient to discount the entirety of his testimony.

In sum, the Court finds that Plaintiff has submitted sufficient evidence to raise a genuine issue of material fact as to whether Defendants breached each of the Scindia duties. There is evidence that the problem which caused the locking pin to come out may have existed when the Vessel was turned over at the commencement of stevedoring operations, that any problem with the gangway arguably should have been discovered when the Vessel crewmember inspected the handrail after the first collapse, and that the Vessel's crewmembers may have been directly notified

---

[11] Defendants attempt to dismiss the entirety of Frizzell's testimony by pointing to evidence that the pin was not in fact defective as Frizzell initially claimed, and that the video evidence contradicts his recounting of events. (Doc. 126, pp. 7–8.) According to Frizzell, he went to the top of the gangway look for a crew member, (doc. 126-11, pp. 2–3), but the video depicts a crew member coming down the gangway, (doc. 126, p. 5). The Court does not find this slight variation in positioning dispositive. As to whether the locking pin was in fact defective, this is a moot point—a reasonable factfinder could listen to Frizzell's testimony and believe that he believed that the pin had a problem, thereby putting the crew on notice to a potential problem with the pin, regardless of whether it was the exact problem Frizzell complained of.

of a problem with the gangway and failed to remedy it.  Accordingly, Defendants' Renewed Joint Motion for Summary Judgment is **DENIED**.  (Doc. 126.)

## II.    Ancillary Defendants' Motion for Summary Judgment

The Court next turns to Ancillary Defendants' separate Motion for Summary Judgment. (Doc. 80.)  In their Motion, Ancillary Defendants argue that, even if Cosco is found liable for Plaintiff's injuries, such liability cannot be attributed to Ancillary Defendants because there is no contractual provision under the Time Charter or Ship Management Agreement that would attribute liability to them.  (See generally id.)  The Court agrees.

First, Ancillary Defendants argue that CSL, as a time charterer, is not liable for negligent acts of the crew under the Time Charter.  (Doc. 80, pp. 4–5.)  "A time charterer who has no control over a vessel assumes no liability for negligence of the crew . . . absent an agreement to the contrary."  Hayes v. Wilh Wilhelmsen Enters., 818 F.2d 1557, 1559 (11th Cir. 1987).  Indeed, under its traditional role, the time charterer "is expressly responsible for directing the commercial activity [of] the vessel, determining the ship's routes, destinations, timing of the mission, and the designation of the cargo," while the vessel owner "remains responsible for the . . . negligence by the crew, and [for providing] a reasonably safe means of access for those boarding or leaving the vessel."  Johnson v. Del Monte Fresh Produce Co., No. 09-22425-CIV-UNGARO, 2010 U.S. Dist. LEXIS 165457, at *17 (S.D. Fla. Dec. 7, 2010) (quoting Becker v. Tidewater, Inc., 586 F.3d 358, 373 (5th Cir. 2009)); Berry v. Mi-Das Line SA, No. 4:08-cv-159, 2009 WL 3112028, *3 (S.D. Ga. Sept. 28, 2009) ("In the traditional division of responsibilities, the vessel's owner is responsible for preparing the ship to be loaded or unloaded, which includes setting and operating the vessel's gangway[;] [t]he time[]charterer is responsible for carrying out loading and unloading activities.").

However, "[w]hile a time charterer is not usually responsible for the crew's negligence," it may "expand its role and undertake additional duties traditionally allocated to the shipowner . . . including those owed to longshoremen." Roberson, 521 F. Supp. 3d at 1335. "The dispositive issue, therefore, is whether the negligence of the Master and crew is attributable to [the charterer]." Hayes, 818 F.2d at 1558. The question of whether the time charterer possessed control over the operation of the vessel that caused the longshoreman's injury, is "a determination which typically hinges on whether the time charter agreement between the vessel owner and the time charterer shifted the relevant operational responsibility from the owner to the charterer." Roberson, 521 F. Supp. 3d at 1333. Accordingly, to determine whether CSL may be responsible for the crew's alleged negligence, the Court must turn to the relevant portions of the Time Charter and determine whether operational responsibility was allocated to CSL.

Ancillary Defendants argue that the Time Charter here contained a "standard Clause 8," in which CSL did not assume any "responsibility for duties owed to others, including longshoremen, for oversight of the crew during the vessel's voyage or cargo operations." (Doc. 80, pp. 2–3.) This Court, in Roberson v. Seaspan Corp., recently addressed the circumstances under which liability can transfer to a time charterer under Clause 8. 521 F. Supp. 3d 1325 (S.D. Ga. 2021). There, the Court found that "the addition of the words 'and responsibility' to the phrase 'at their expense' in Clause 8 resulted in the shifting of responsibility for injuries to a longshoreman due to negligence during the discharge of cargo" to the time charterer. Id. at 1336. As Ancillary Defendants point out, this "and responsibility" language is absent from Clause 8 of the Time Charter at issue in this case. (See doc. 80-3, p. 3 ("[T]he Charterer shall perform all cargo handling . . . at their risk and expense, under the supervision of the Master.").) Indeed, Plaintiff agrees that the Time Charter

did not include "any assumption of responsibility for duties owed to others."  (Doc. 81, p. 3; doc. 98-1, p. 1.)

Furthermore, for reference, Ancillary Defendants have demonstrated that the standardized form frequently used in the industry, a New York Produce Exchange ("NYPE") time charter, uses language identical to the Time Charter here.  (Doc. 80, p. 3 (citing BIMCO, Contracts and Clauses, NYPE 93, https://www.bimco.org/contracts-and-clauses/bimcocontracts/nype-93).)   "[T]he traditional form of Clause 8 in an NYPE time charter agreement . . . has long been held to not result in a shift of responsibility to a time charterer for longshoremen's injuries sustained during cargo operations." Roberson, 521 F. Supp. 3d at 1335.  This "typical clause" does not give a time charterer "any operational control over these activities" but rather specifies "upon whom the ultimate financial cost rests for any one or more of the activities." D/S Ove Skou v. Hebert, 365 F.2d 341, 351 (5th Cir. 1966);[12] Hendricks v. Earling Shipping Co., No. 2:97-cv-121, 1998 WL 684206, at *2–4 (S.D. Ga. May 4, 1998) (finding a clause providing that "Charters are to load, stow, trim, lash, unlash, and discharge the cargo at their expense" did not transfer liability for longshoreman's injuries arising out of improper discharge of cargo to time charterer); accord Mallard v. Aluminum Co. of Can., Ltd., 634 F.2d 236, 242 n.5 (5th Cir. 1981) ("In light of Skou, this circuit seems reluctant to find any shift of operational responsibility for personal injuries to the time charterer absent clear language to that effect.").[13]  As Ancillary Defendants properly

[12]  While Skou was decided prior to the 1972 amendments to the LHWCA, the Eleventh Circuit Court of Appeals has not overruled its holding with respect to time charterers.  See Hayes, 818 F.2d at 1559 n.1 (clarifying that while the Eleventh Circuit may eventually overturn Skou, as some of the underlying rationale is undercut by the 1972 Amendments, it remains binding law); Roberson, 521 F. Supp. 3d at 1335 n.9 ("[T]he Eleventh Circuit has since questioned—but not overruled—the vitality of Skou."); Hendricks, 1998 WL 684206, at *4 ("While the Eleventh Circuit eventually may adopt [the p]laintiffs' position [that Skou is no longer good law], this Court must await such a ruling.").

[13] The Eleventh Circuit has adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals rendered prior to October 1, 1981.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981).

contend, and as Plaintiff does not challenge, there is no language added to modify the standard agreement to attribute any additional liability other than what is standardly attributed to a time charterer.

The same logic likewise applies to Shanghai Ocean's liability under the Ship Management Agreement.   As Plaintiff concedes, the Ship Management Agreement does not "include *any* assumption of responsibility for duties owed to others, including longshoremen, for oversight of the crew during the [V]essel's voyage or cargo operations."  (Doc. 81, p. 3; doc. 98-1, p. 1 (emphasis added).)  Therefore, the Court likewise finds Plaintiff has failed to provide a basis for liability on the part of Shanghai Ocean.

Notably, in his Response, Plaintiff neglects to direct the Court to any authority or otherwise provide the Court with any argument as to how the language of the Time Charter or the Ship Management Agreement would dictate shifting responsibility from Cosco to CSL or to Shanghai Ocean.  (See generally doc. 98.)[14]  Accordingly, in the absence of any contract provision under the Time Charter or Ship Management Agreement, and because Plaintiff has failed to provide any substantive response to Ancillary Defendants' arguments, the Court **GRANTS** Ancillary Defendants' Motion for Summary Judgment as to all claims against them.  (Doc. 80.)

---

[14]   Indeed, in his Response, Plaintiff offers no arguments specific to Ancillary Defendants' Motion and instead submits a nearly identical brief to what he filed in response to Defendants' original joint Motion for Summary Judgment, (doc. 84).  (Compare doc. 98, with doc. 130.)  The Court is further confused by Plaintiff's Response to Defendants' Statement of Undisputed Facts and Conclusions of Law, in which he explicitly states that it is "[g]enerally not in dispute" that "[t]here is no basis under [Section] 905(b) to hold Shanghai Ocean liable," or that there is no provision "that would render CSL liable," (doc. 98-1).  While the Court is tempted to find that Plaintiff simply concedes this point, it declines to do so because Plaintiff nevertheless included language asking the Court to deny Defendants' Motion "[i]f the [C]ourt were to find that either of the 'ancillary defendants' are vessel owners."  (Doc. 98-1, p. 2.)  Accordingly, the Court has analyzed and found appropriate grounds for granting Ancillary Defendants' Motion.

### III.    Defendants' Motion for Partial Summary Judgment on Future Earnings

Defendants additionally move for partial summary judgment as to Plaintiff's future lost earnings claim, arguing, *inter alia*, that Plaintiff cannot prove the requisite specificity of his damages.  (See generally doc. 82.)  Specifically, Defendants argue that Plaintiff's claim cannot proceed because he has offered no evidence to show that he has actually lost any wages or earnings capacity.[15]  (Doc. 82, pp. 8–11.)  Defendants point out that Plaintiff is making more money now than he was prior to his injury, and he has not been placed under any medical limitations since returning to work in July 2020.  (Id. at p. 11.)  Plaintiff, however, maintains that he has shown his claim for future lost earnings with a "reasonable degree of certainty" and argues that, while he is working more hours now, he would be able to work even more if not for his injury.[16]  (Doc. 95, pp. 11–17.)

---

[15]  Defendants additionally argue that summary judgment should be granted on this issue because Plaintiff has violated Federal Rule of Civil Procedure 26(a) by not providing a computation of his claim for lost future earnings, leaving Defendants to "piece together Plaintiff's theory of recovery for future lost wages." (Doc. 82, p. 7.) According to Defendants, Plaintiff's future lost earnings claim "should be rejected for this reason alone." (Id.)  Even assuming, arguendo, that Plaintiff did violate rule 26, the Court notes that while a pretrial failure to comply with Rule 26(a) can serve a basis to preclude the use of such information at trial, generally "[f]ailure to comply with Rule 26 disclosures is not a basis for summary judgement." Torres v. First Transit, Inc., No. 17-CV-81162, 2018 WL 4469026, at *4 (S.D. Fla. Sept. 18, 2018).  This is because discovery disputes are best resolved by discovery motions, such as a motion to compel, rather than imposing the overly harsh sanction of summary judgment. Navarro v. Cohan, 856 F.2d 141, 142 (11th Cir. 1988) ("The sanction of dismissal is an extreme remedy and should not be imposed if lesser sanctions will suffice.")  Nevertheless, because the Court finds a basis for granting the Motion on other grounds, the Court need not reach the merits of Defendants argument to this point in full.

[16]  Plaintiff additionally contends that the Court should deny Defendants' Motion outright because they failed to comply with the procedures in the Court's Rule 26 Instruction Order, which required the parties to undertake "a sincere, good faith effort to resolve [any discovery] dispute" without Court intervention, and, if unsuccessful, schedule a conference with the Magistrate Judge "in an effort to resolve the discovery dispute prior to the filing of any motions," (doc. 79-1, p. 6).  (Doc. 95, pp. 3–5.)  Plaintiff argues that the present Motion is akin to a motion for discovery sanctions, and the Court should thus refuse to consider it as Defendants did not schedule a conference in accordance with the Rule 26 Order. (Id. at pp. 4–5.)  While Defendants' Motion may concern a discovery dispute, it goes beyond what is contemplated by the Rule 26 Order because Defendants' overarching contention is that Plaintiff cannot provide any reasonable basis for his lost earnings claim.

"An award for impaired earning capacity is intended to compensate the worker for the diminution in [his] stream of income." Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 533 (1983). "The goal is to replicate as accurately as possible . . . the injured plaintiff's lost stream of future income," which "is composed of the [difference] between what [Plaintiff] would have earned had he not been injured and what his forecasted actual earnings will be, given his injuries." Deakle v. John E. Graham & Sons, 756 F.2d 821, 830 (11th Cir. 1985). To make a claim for future lost earnings, an aggrieved plaintiff must prove his or her damages with a "reasonable degree of certainty." Buland v. NCL (Bah.) Ltd, 992 F.3d 1143, 1152 (11th Cir. 2021) (quoting Guyana Tel. & Tel. Co. v. Melbourne Int'l Commc'ns, Ltd., 329 F.3d 1241, 1248 (11th Cir. 2003)). Furthermore, proving damages to a reasonable degree of certainty means that such "[d]amages may not be determined by mere speculation or guess." Baucom v. Sisco Stevedoring, LLC, 560 F. Supp. 2d 1181, 1205 (S.D. Ala. 2008) (quoting Maiz v. Virani, 253 F.3d 641, 664 (11th Cir. 2001)).

The Court finds that Plaintiff has failed to point to sufficient evidence that his future lost earnings claim amounts to more than "mere speculation or guess." Id. Plaintiff has admitted that he is working more hours and earning more wages than before his injury. (Doc. 95, p. 17.) Since returning to work post-injury, he continues to work primarily as a lasher, the same position he primarily worked in before his injury. (Doc. 95-1, pp. 2–3.) Plaintiff even continues to engage in the same types of activities in his personal life as he did before, claiming only that it is slightly more difficult to lift things and that he gets sore more easily. (Id. at p. 3; doc. 82-2, p. 8.) Plaintiff concedes that he has never applied for "social security disability" and testified that he was never instructed by his physician to limit his hours or the type of work he can engage in. (Doc. 82-2, pp. 25–26.) Indeed, the record is devoid of *any* evidence from a medical professional concerning *any*

limitations on Plaintiff's ability to work.  See Santana v. Westport Glob. LLC, No. 07-20167-CIV, 2008 WL 11471055, at *11 (S.D. Fla. July 1, 2008) (denying a claim of future lost wages where the plaintiff's doctors had not indicated that the plaintiff had any work restrictions and where the plaintiff continued to work in his same position following the injury); cf. Dossie v. Sherwood, 707 S.E.2d 131, 189 (Ga. Ct. App. 2011) (finding a physician's corroborating testimony of the plaintiff's physical limitations in a specific six month period persuasive in determining that the plaintiff had advanced a lost profits claim with a reasonable degree of certainty).

Aside from these vague statements that his injury has affected his physical abilities, Plaintiff's entire claim is based on his personal belief that he would be able to work "at least 15 more hours a week than what [he is currently] working."  (Doc. 82-2, p. 25.)  Beyond this statement, Plaintiff has presented *no* evidence to corroborate his claim that, but for his injury, he would be working fifteen more hours.  Indeed, the only evidence he has provided regarding this alleged increase in workload is one article describing a boom in work for the port, which fails to specify how—much less to what degree—this increased growth translates to increased working hours for longshoremen.  (Doc. 95, p. 16 n.4.)  Moreover, Plaintiff has failed to explain how this article would be reduced to admissible evidence at trial.  Without any information regarding the type of work available, specific hours available, or how Plaintiff would manage to work this increased hour load, Plaintiff's personal belief that he could work more hours simply does not reach the level of specificity required to prevail on a future loss of earnings claim.  See Buland, 992 F.3d at 1152 (denying a claim for future lost wages as unduly speculative because it was based solely on what the plaintiff "believe[d] he [was] qualified and capable of performing"); Weeks Marine, Inc. v. Wright, No. CIV.A. 14-00231-KD-B, 2015 WL 4389918, at *8 (S.D. Ala. July 15, 2015) (finding the plaintiff failed to provide evidence to prove up his future lost wages with the

requisite "reasonable certainty" where he relied only on "his subjective evaluation of his abilities" and failed to "present any vocational expert testimony to support his contention"); Santana, 2008 WL 11471055, at *10 (dismissing claim for future lost wages where, despite the fact that the plaintiff suffered a permanent injury, no expert testified as to precisely how this permanent injury would limit his ability to work). Accordingly, Defendants' Motion for Partial Summary Judgment on Plaintiff's claim for future lost earnings is **GRANTED**. (Doc. 82.)

<strong>CONCLUSION</strong>

Based upon the foregoing, the Court finds that Plaintiff has produced sufficient evidence to raise a genuine issue of material fact as to whether the Vessel negligently caused the gangway's handrail to collapse which resulted in Plaintiff's injuries. Accordingly, the Court **DENIES** Defendants' Renewed Joint Motion for Summary Judgment. (Doc. 126.) However, the Court finds that Plaintiff has failed to produce any evidence providing a basis for attributing liability to the time charterer or ship management company, and accordingly **GRANTS** Cosco Shipping Lines Co. Ltd. and Shanghai Ocean Shipping Co. LTD's Motion for Summary Judgment as to all of the claims against them.[17] (Doc. 80.) Finally, the Court finds that Plaintiff has failed to raise a triable issue as to his claim for loss of future earnings and, accordingly, **GRANTS** Defendants' Motion for Partial Summary Judgment as to that claim. (Doc. 82.)

**SO ORDERED**, this 6th day of October, 2023.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[17] The Court **DIRECTS** the Clerk of Court to update the docket accordingly.