IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ROMARE J. GREENE,

    Plaintiff,

v.

COSCO SHIPPING CAMELLIA LIMITED,

    Defendant.

CIVIL ACTION NO.: 4:20-cv-91

**O R D E R**

Presently before the Court is Defendant COSCO Shipping Camellia Limited's Motion for Reconsideration. (Doc. 140.) Defendant moves for reconsideration of the Court's Order denying its request for summary judgment on Plaintiff's negligence claim, (doc. 139). For the reasons below, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion for Reconsideration. (Doc. 140.)

BACKGROUND

Defendant's Motion does not take issue with the facts as described by the Court in the Order denying summary judgment. That full factual description can be found in Background Section II of the Order. (Doc 139, pp. 3–6.) The following facts are material to the present Motion.

At the time of his injury, Plaintiff was working as a longshoreman aboard Defendant's ship (the "Vessel"). (Doc. 96, p. 1.) To perform his work, Plaintiff had to embark and disembark the Vessel via a "gangway," which has handrails on either side that are raised and fastened in the

middle by a pin, which ensures that the handrails cannot draw apart and collapse. (See doc. 126, p. 2; see doc. 126-8, p. 9.) The pin has a toggle which serves to prevent the pin from working itself back out of the handrail. (Doc. 126, pp. 2–3; doc. 126-8, p. 9.) It is the job of the Vessel's crew to rig the gangway before cargo operations begin so that longshoremen can embark and disembark the Vessel. (Doc. 130-1, pp. 44–46.) Defendant also requires a watchman from the crew to supervise the gangway to ensure it stays safe during any change in conditions. (Id. at pp. 47, 104–05.)

On the day of the incident, the Vessel's crew had rigged the gangway before cargo operations began. (Doc. 126, p. 4.) Shortly after the longshoremen began embarking the Vessel via the gangway, the gangway's handrail collapsed. (Id. at p. 5; doc. 105, at 19:06:07 (depicting the handrail first collapsing).) No longshoremen were injured in this incident. (Doc. 126-11, p. 2.) According to David Frizzell, who was working as a longshoreman and was present during the first handrail collapse, the longshoremen who were "stranded on the gangway" first attempted to get the attention of the Vessel's crew, but when they could not immediately get someone's attention, they "worked to put the handrail back in place until [they] could get the attention of a ship's mate." (Id.) Frizzell stated that when two members of the Vessel's crew (or "mates") arrived at the top of the gangway, Frizzell got their attention and complained to them. (Id.) According to his own testimony, Frizzell then "pointed out exactly what happened, showed the mates that the pin was missing a locking end, and . . . demanded that [the mate] and the other crew members fix it and go back down and check the handrail and all securing pins." (Id. at pp. 2–3.) According to Frizzell, one of the mates then "assured [him] that he was correcting the problem" and said he would check all the pins, and the mate then descended the gangway. (Id. at p. 3.)

Video evidence shows, following the initial collapse, a group of longshoremen congregated around the collapsed handrail while a mate descended the gangway. (Doc. 105, at 19:06:07–19:06:30.)  Based on the video footage, it appears that the mate then supervised the process of the longshoremen raising the gangway rail into place.  (Doc. 126, pp. 5–6 ("The mate has descended and is inspecting the pin with [the] longshoremen."); see doc. 105, 19:06:30–19:06:47.)  Once the handrail was seemingly raised into place, the video appears to depict the mate leaning over the handrail to inspect the pin before ascending the gangway to the Vessel. (Doc. 105, 19:06:42–19:06:50; see also doc. 126 (describing the video as showing the mate "tak[ing] one more look [at] . . . the gangway" while the longshoremen stand by).)

Roughly thirty minutes later, Plaintiff descended the gangway and, as he reached the bottom landing, the handrail again collapsed, causing him to fall onto the dock below.  (Doc. 126, p. 9; doc. 130, p. 11.)  Plaintiff filed this suit alleging a variety of negligence-based theories on the part of Defendant with regard to the handrail.

After recounting these facts in the Order on summary judgment, the Court explained:

> The parties agree the handrail collapsed because a locking pin came out of place. (Doc. 94, p. 2; doc. 86, p. 2.)  However, the parties disagree as to what caused the pin to fall out.  Plaintiff maintains that the pin was negligently installed, and that this negligence is attributable to the Vessel's crew.  (See doc. 130, pp. 10–11; doc. [1]26-8, p. 21.)  Defendants simply maintain that they do not know what caused the pin to fall out, but that the installation, and thus any negligent installation of the pin, is solely attributable to the longshoremen. (Doc. 126, pp. 4–5.)

(Doc. 139, pp. 5–6.)  The Court then reviewed the relevant law: the Longshore and Harbor Worker's Compensation Act ("LHWCA") and the related "Scindia duties" (the three distinct duties owed by shipowners to longshoremen).  (Id. at pp. 10–11.)  Because Defendant's Motion for Summary Judgment argued "that Plaintiff's injuries resulted from negligence of his fellow

3

longshoremen, and that the [V]essel owed no duty to Plaintiff under any of the Scindia duties," the Court proceeded to evaluate whether the facts could support a claim under each of the three duties. (Id. at p. 11.) The Court found that there was sufficient evidence to support a finding by a jury that Defendant owed and breached each of the three Scindia duties. Defendant's Motion for Reconsideration takes issue, in some way or form, with each of these three determinations and asks the Court to reconsider the prior Order, find no evidence to support a finding of a breach of any of the three duties, and grant summary judgment in Defendant's favor on the negligence claim (Plaintiff's sole claim against Defendant). (Doc. 140.)

## STANDARD OF REVIEW

The decision to grant a motion for reconsideration is committed to the sound discretion of the district court. Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1216 (11th Cir. 2000). Motions for reconsideration are to be filed only when "absolutely necessary" where there is: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact. Bryan v. Murphy, 246 F. Supp. 2d 1256, 1258–59 (N.D. Ga. 2003); Greene v. Bd. of Regents of Univ. Sys. of Ga., No. 4:21-CV-277, 2023 WL 5837501, at *29 (S.D. Ga. Sept. 8, 2023). "An error is not 'clear and obvious' if the legal issues are 'at least arguable.'" United States v. Battle, 272 F. Supp. 2d 1354, 1358 (N.D. Ga. 2003) (quoting Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc., 763 F.2d 1237, 1239 (11th Cir. 1985)). Motions for reconsideration are not appropriate to present the Court with arguments already heard and dismissed, to repackage familiar arguments, or to show the Court how it "could have done it better" the first time. Pres. Endangered Areas of Cobb's Hist., Inc. v. United States Army Corps of Eng'rs., 916 F. Supp. 1557, 1560 (N.D.

4

Ga. 1995), *aff'd*, 87 F.3d 1242 (11th Cir. 1996); Pottayil v. Thyssenkrupp Elevator Corp., 574 F. Supp. 3d 1282, 1301 (N.D. Ga. 2021).

## DISCUSSION

Defendant argues that the Court committed two errors.  First, it claims the Court, in denying summary judgment, improperly considered and relied upon a theory not presented by Plaintiff, specifically that the locking pin had some defect (as opposed to having simply been installed negligently). (Doc. 140, p. 1 (citing Fils v. City of Aventura, 647 F.3d 1272, 1284–87 (11th Cir. 2011)).)  Additionally, Defendant claims that the Court misconstrued 33 U.S.C. § 905(b) and Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981), in allowing what is "effectively" an (impermissible) unseaworthiness or strict liability claim to proceed to a jury. (Id. at pp. 1–2; see also id. at p. 16 ("By allowing Plaintiff's claim to proceed despite no identification of a specific hazard attributable to alleged negligence of the crew as opposed to the longshoremen, the Order also inadvertently has allowed an unseaworthiness claim to go to the jury.").)

The Court has re-reviewed the parties' original briefing. (Docs. 126, 130, 132, 136 & 138.) Although Frizzell clearly testified (through an affidavit) that he observed a "problem"—specifically, that the pin at the location of the collapse "was *missing a locking end*" and "the pins being used by the crew were not properly secured with a locking end," (doc. 126-11, pp. 2–3)—Defendant is correct that Plaintiff, in opposing Defendant's Motion for Summary Judgment, did not expressly present or rely on a theory that the at-issue locking pin itself was defective and instead argued—albeit unclearly at times—that the pin was negligently installed.  Thus, Defendant correctly points out that the Court should not have considered this evidence when deciding whether Plaintiff made the necessary showing as to each of the Scindia duties.  Defendant also correctly

5

asserts that Plaintiff instead repeatedly claimed that the locking pin had been negligently installed prior to the second collapse.  (See, e.g., doc. 130, p. 29 ("Whenever the vessel mate who inserted the pin did so improperly. . ."); id. at pp. 6–7 (pointing to expert's testimony that he believed the locking pin "must not have been inserted correctly" and emphasizing that the expert relied on "[t]he absence of a material defect with the pin itself"); id. at p. 11 (". . . an examination of the evidence and consideration of alternative causes reveals valid, logical conclusions supported by the evidence, including: the locking pin more likely than not came out because it was **'not correctly inserted, or it was improperly secured'**") (emphasis in original) (citing doc. 86-3 at 2 and doc. 86-5 at 2)); doc. 136, p. 2 ("The evidence demonstrates that an improperly installed and secured locking pin was a cause of both the first and the second collapse."); id. at p. 6 ("[T]he Defendants in this case never turned over a reasonably safe vessel because the only means of access from vessel to shore (the gangway) was left in a discreet but defective condition—with an improperly secured pin.").)  In light of the foregoing, the Court reconsiders its decision to consider and rely on the evidence of a defect in the pin.[1]

Accordingly, at trial, Plaintiff will not be permitted to present the jury with a theory that the locking pin that was in the handrail at the time of the collapse that caused Plaintiff's fall was itself defective in some way.  Although there was evidence relating to such a theory, Plaintiff waived any such theory by not presenting it in his summary judgment briefing or otherwise notifying Defendant that he asserted any claim of a defective pin.  This does not, however, automatically entitle Defendant to summary judgment.  As explained below, while the Court must

---

[1] In his one-and-a-half-page response to the Motion for Reconsideration, Plaintiff made no effort to justify the Court's reliance on this theory much less to argue that he had in fact relied upon such a theory in opposition to summary judgment (or at any other time in the case).  (See doc. 141.)

reverse its ruling as to the turnover duty and the duty to intervene, a material issue of fact remains as to whether Defendant breached the active control duty.

First, both the turnover duty of safe condition and the turnover duty to warn "relate to the condition of the ship *upon commencement of stevedoring operations*," which means that "a breach of the turnover duty must occur at the moment of turnover." Mosley v. Ceres Marine Terminals, Inc., 576 F. Supp. 3d 1358, 1365 (S.D. Ga. 2021) (emphasis added). It is undisputed that the railing collapsed once after stevedoring operations commenced but *before* the collapse that caused Plaintiff to fall, and that the locking pin was re-installed after that initial collapse. Accordingly, there is no evidence Plaintiff's injury resulted from the way the pin was installed at the time the Vessel was turned over and Defendant is therefore entitled to summary judgment as to the turnover duties.

Likewise, without the theory that there was a defect with the locking pin, Plaintiff cannot avoid summary judgment on the duty to intervene. The duty to intervene is triggered only when a shipowner "has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of obviously improvident judgment, has failed to remedy it." Miller v. Navalmar (UK) Ltd., 685 F. App'x 751, 757 (11th Cir. 2017) (internal quotations omitted). Moreover, even if the defendant has actual knowledge, there must be evidence "that the defendant[ was] actually aware that an unreasonable risk of harm was created by the condition." Mosley, 576 F. Supp. 3d at 1371 (internal quotations omitted). There is not adequate evidence that Defendant knew that the locking pin had been negligently installed before the second collapse. Accordingly, Defendant is entitled to summary judgment as to the duty to intervene.

As to the active control duty, however, the Court's ruling did not hinge on whether the locking pin was potentially defective. (See doc. 139, pp. 12–18.) In ruling on this Scindia duty, the Court noted that there was sufficient evidence that the gangway was—as is customary—under the control and monitoring of the Vessel at the time the railing was re-raised (after the initial collapse) through the time of Plaintiff's fall. (Id. at p. 15–16.) The Court also held that there was sufficient evidence to show Defendant breached the active control duty. As the Court explained in its Order:

> Plaintiff has submitted admissible expert testimony that, before the handrail's second collapse, the pin "must not have been inserted correctly." (Doc. 86-3, p. 2; doc. 86-13, p. 2 (concluding that the pin "was not fully inserted as the gangway safety rails were erected, allowing it to back out and become disengaged"); see also doc. 126-8, p. 20 (finding "the only conclusion you can make is that the pin was never inserted correctly in the first place" and discounting the possibility that the pin worked itself out without improper installation).) If the fact finder believes Plaintiff's experts' theory that the pin was negligently inserted, then it could further reasonably find that the Vessel crew member who checked the pin's installation (as the video evidence arguably depicts (see doc. 105, 19:06:30–19:06:47)) should have appreciated that the pin was improperly inserted.

(Doc. 139, pp. 17–18 (footnote omitted).) While the Court referenced Frizzell's testimony that he believed—and told the Vessel's mate—that there was a "problem" with the pin, the Court stated only that this testimony "bolstered" the determination that a jury issue existed. The Court was not relying specifically on Frizzell's belief that the locking pin was defective. Moreover, after Frizzell and the other longshoremen got the handrail back up, he found a Vessel mate and made them aware of the situation (the collapse of the railing), demanded that the mate go check the locking pin and fix any issue, and was told that such action would be undertaken. Accordingly, the Court will not reconsider its determination that there is a genuine issue of material fact as to whether the Vessel's crew had constructive knowledge of the hazard that Plaintiff's experts claim was present—that is,

8

the locking pin that had been improperly installed by the longshoremen. Some evidence exists that those longshoremen were not charged with (or expected to have the expertise on) ensuring that the handrail was properly raised or that the pin was properly installed and that they only performed these tasks to traverse the remainder of the gangway.

As an issue of fact remains on whether there was a breach of the active control duty, summary judgment in favor of Defendant on Plaintiff's negligence claim remains improper. Additionally, the Court rejects Defendant's argument that the Court is allowing Plaintiff to proceed on an improper "strict liability" claim. Specifically, Defendant claims "[t]he Order's holding that an unidentified 'problem' might have existed leaves [Defendant] in the dark as to what it is that the crew should have observed and cured." (Doc. 140, p. 2.) First, the Court has reconsidered its reliance on any "defective pin" theory (which is what Defendant is referring to when it uses the term "unidentified 'problem'") and has adjusted its holdings accordingly. Additionally, Plaintiff has relied on and presented sufficient evidence of negligence. Plaintiff's expert witnesses opine that the pin was negligently installed, causing it to fall out. Particularly given the Court's revisions to the previous Order, the remaining dispute centers on whether Defendant was responsible, through the active control duty, for Plaintiff's injury that allegedly resulted from the problematic installation. Accordingly, the Court rejects Defendant's argument that the Court has allowed Plaintiff to proceed with what amounts to an improper strict liability claim that the Vessel was unseaworthy.

## CONCLUSION

In light of the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion for Reconsideration. (Doc. 140.) Plaintiff did not present evidence to support a theory

that the locking pin was defective.  Therefore, the Court reconsiders and vacates its determinations that Plaintiff could proceed on his claim that Defendant breached the turnover duty, (doc. 139, pp. 11–12), and the duty to intervene, (id. at pp. 18–21).  That said, the Court, does not reconsider or vacate its determination that Plaintiff presented sufficient evidence that he was injured due to Defendant's breach of the active control duty.  (See id. at pp. 12–18.)

**SO ORDERED**, this 12th day of November, 2024.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA